**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-945-WJM-STV

TAGE RUSTGI,

      Plaintiff,

v.

STEVE REAMS, in his individual and official capacities,
MICHAEL RECOR, in his individual capacity,
TYLER PISCOYA, in his individual capacity,
CORY CHANNEL, in his individual capacity,
JOSEPH MARTINEZ, in his individual capacity,
MICHAEL THOMPSON, in his individual capacity,
KYLE PENNY, in his individual capacity,
ANDREW WILSON, in his individual capacity,
SAVANNAH COBLE, in her individual capacity,
ANNA ERICKSON, in her individual capacity,
BOARD OF COUNTY COMMISSIONERS OF COUNTY OF WELD, COLORADO,

      Defendants.

---

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

---

      Plaintiff Tage Rustgi, by and through counsel David G. Maxted of the law firm MAXTED LAW LLC, and Kathryn J. Stimson of the law firm STIMSON STANCIL LABRANCHE HUBBARD LLC, respectfully alleges this Complaint and Jury Demand as follows:

**INTRODUCTION**

      1.     This case involves a brutal and unlawful use of excessive force against Plaintiff by Weld County Sheriff's Office ("WCSO") employees, and a shocking policy and custom of militarized violence and weaponry used to terrorize and abuse pretrial detainees in Weld County jail (the "jail"). On June 23, 2018, Defendants fired multiple shotgun "concussion explosives" in Plaintiff's direction and smashed his face into the floor while he lay face-down and helpless.

Plaintiff suffered a large gash to his forehead, hemorrhaging in his left eye, and a concussion as a result of the Defendants' actions.

2.       Plaintiff was a college student at the time, had no criminal record, had committed no crime, and did nothing to justify Defendants' violence against him. In fact, no charges were filed against Plaintiff.

3.       The civil rights violations in this case were caused directly by the conduct and policies of Defendants Steve Reams and Weld County. As detailed herein, since at least 2016, Defendant Reams has implemented a violent, militarized group of deputies called the "Special Operations Group" ("SOG" or SOGs") within WCSO. Defendant Reams hired a contractor named Joseph Garcia to assist him in training and implementing the Special Operations Group in WCSO. Defendant Reams and Garcia trained deputies to use a variety of weapons and tactics in the jail setting, including shotguns, concussion explosives, and physical violence, as used against Plaintiff.

4.       Joseph Garcia, through a variety of shell companies, has promoted the use of unconventional militaristic "Special Forces" tactics and weaponry in the jail setting which he calls a Special Operations Group. Garcia markets Kel-Tec KSG 12-gauge Shotguns ("Kel-Tec Shotguns")—the same weapon used on Plaintiff—and provides training, supervision, and policy advice to WCSO. Defendant Reams intentionally hired Garcia from 2016 to the present to assist him in implementing the unconstitutional policies and training described herein, which are also contrary to any legitimate penal justification, contrary to appropriate standards in the detention setting, and extremely dangerous and unnecessary.

2

5.      The Special Operations Group functions as a militarized combat force trained to intimidate, terrorize, and brutalize people detained in the Weld County jail. Defendant Reams trains and authorizes deputies to use Kel-Tec Shotguns, which can fire live ammunition, concussion explosions, and rubber bullets capable of putting a hole in a person's leg.

6.      The concussion explosions fired from Kel-Tec Shotguns, as used against Plaintiff, create an extremely forceful, deafening blast capable of causing severe injury or death. The use of the KSG Shotguns and explosive ammunition, as alleged herein, is contrary to the appropriate use of such weaponry and is extremely dangerous in the jail setting.

7.      Defendant Reams arms his SOGs and deploys them in the jail as if they are going into combat. The SOGS are trained to intimidate and be unnecessarily aggressive and violent with detainees, and to escalate the use of force against detainees unreasonably and precipitously. The SOGs are trained by Defendant Reams to view themselves as warriors against enemy combatants, to use weapons unlawfully and dangerously, and generally to treat detainees held in the jail as enemies to be intimidated and victimized by violence.

8.      Defendant Reams has implemented a policy and procedure where, for several years including the time period of this incident, multiple SOGs have patrolled the jail constantly outfitted in green Army-style battle fatigues, military-style helmets and vests, and armed with Kel-Tec Shotguns and a variety of other weapons. These Kel-Tec Shotguns are routinely brandished, pointed at, and fired against detainees unreasonably, and the SOGs purposefully seek to intimidate and terrorize pretrial detainees using the Kel-Tec Shotguns.

9.      The training, policies, and procedures of Defendants Reams and Weld County caused the constitutional violations in this case. Defendant Reams chose to implement the SOG

3

policies and procedures, and he has implemented a custom, pattern, and policy of shocking and abusive militarized excessive force in the jail which he knew would lead to excessive force as it did against Plaintiff, as any objectively reasonable official would know.

10.     According to records and on information and belief, Defendants Andrew Wilson, Tyler Piscoya, and Kyle Penny were members of the Special Operations Group at all times relevant to this lawsuit. Defendants Joseph Martinez and Cory Channel were Sergeants and had supervisory authority during the incident in this case. Defendants Michael Recor, Michael Thompson, Savannah Coble, and Anna Erickson, were deputies (or other staff level) employees of the WCSO at all times relevant.

11.     Public reports reveal that due to evidence of civil rights violations including unlawful use of force occurring in Weld County jail dating back to at least 2017, the Office of the United States Attorney for Colorado, an arm of the United States Department of Justice ("DOJ"), has launched an inquiry into civil rights abuses in the jail.

12.     Defendants' unlawful actions violated Plaintiff's constitutional right as a pretrial detainee not convicted of anything to be free from excessive force and violations of due process as guaranteed by the Fourth and Fourteenth Amendments, causing Plaintiff significant pain, injuries, and emotional distress.

13.     Defendant Reams and Weld County have refused to disclose incident reports, use of force reports, or body camera footage in response to records requests regarding these matters, but have admitted these records exist. The WCSO only produced to Plaintiff a list of names of some of the Defendants responsible and has refused to provide the actual records which would allow Plaintiff to identify all Defendants, and to allege herein exactly what each Defendant did in

the course of this incident. Defendant Reams and the County, and the Defendants themselves, are in exclusive possession of this information because Plaintiff has no other means of access. Plaintiff therefore will seek immediate discovery of these records so that all appropriate Defendants can be named, and their conduct described, by amendment of this Complaint prior to the statute of limitations which will run on June 23, 2020.

## JURISDICTION AND VENUE

14.     This action arises under the Constitution and laws of the United States and the State of Colorado and is brought pursuant to Title 42 U.S.C. § 1983.

15.     Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

16.     Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

17.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein, or a substantial part of the events, occurred within the State of Colorado.

## PARTIES

18.     Plaintiff is a citizen of the United States and was at all times relevant hereto a resident of and domiciled in the State of Colorado.

19.     At all times relevant to this Complaint, Defendant Reams was a citizen of the United States, a resident of and domiciled in the State of Colorado, and was acting under color of state law in his capacity as the Sheriff employed by the Weld County Sheriff's Office. As the Sheriff, Defendant Reams was also a policymaker and final decisionmaker for the Weld County Sheriff's Office and Weld County. He is sued in both his individual and official capacities.

20.     At all times relevant to this Complaint, Defendant Channel was a citizen of the United States, a resident of and domiciled in the State of Colorado, and was acting under color of state law in his capacity as a Sergeant employed by the Weld County Sheriff's Office.

21.     At all times relevant to this Complaint, Defendant Martinez was a citizen of the United States, a resident of and domiciled in the State of Colorado, and was acting under color of state law in his capacity as a Sergeant employed by the Weld County Sheriff's Office.

22.     At all times relevant to this Complaint, Defendant Thompson was a citizen of the United States, a resident of and domiciled in the State of Colorado, and was acting under color of state law in his capacity as a Sergeant employed by the Weld County Sheriff's Office.

23.     At all times relevant to this Complaint, Defendant Recor was a citizen of the United States, a resident of and domiciled in the State of Colorado, and was acting under color of state law in his capacity as a Deputy employed by the Weld County Sheriff's Office.

24.     At all times relevant to this Complaint, Defendant Penny was a citizen of the United States, a resident of and domiciled in the State of Colorado, and was acting under color of state law in his capacity as a Deputy employed by the Weld County Sheriff's Office.

25.     At all times relevant to this Complaint, Defendant Piscoya was a citizen of the United States, a resident of and domiciled in the State of Colorado, and was acting under color of state law in his capacity as a Deputy employed by the Weld County Sheriff's Office.

26.     At all times relevant to this Complaint, Defendant Wilson was a citizen of the United States, a resident of and domiciled in the State of Colorado, and was acting under color of state law in his capacity as a Deputy employed by the Weld County Sheriff's Office.

27.     At all times relevant to this Complaint, Defendant Coble was a citizen of the United States, a resident of and domiciled in the State of Colorado, and was acting under color of state law in her capacity as a Deputy employed by the Weld County Sheriff's Office.

28.     At all times relevant to this Complaint, Defendant Erickson was a citizen of the United States, a resident of and domiciled in the State of Colorado, and was acting under color of state law in her capacity as a Deputy employed by the Weld County Sheriff's Office.

29.     Defendant the Board of County Commissioners of Weld County, Colorado ("Weld County" or the "County") is a governmental entity charged under the laws of Colorado and is a policymaker and final decisionmaker for the County. Defendant Weld County funds, oversees, operates, and sets policy for the Weld County jail and the WCSO, in coordination with Defendant Reams and the WCSO. Weld County is a proper defendant to this action pursuant to C.R.S. § 30-11-105.

## FACTUAL ALLEGATIONS

30.     While a college student at the University of Colorado in Boulder, Plaintiff returned to his home in Weld County for the Greeley Stampede occurring on June 23, 2018. He celebrated the event with friends and family, which involved music shows, a rodeo, and food and drink.

31.     Although Plaintiff had committed no crime, at some point the evening of June 23, he was placed in a detox hold allegedly due to having consumed an excess of alcohol during the festivities. No criminal charges were filed against Plaintiff in any court arising from the events of the day. Plaintiff was then transferred to the Weld County North Jail Complex ("the jail") and detained for unclear reasons.

7

32.     In the jail, video surveillance footage confirms part of what happened next. Plaintiff was brought into the jail in handcuffs and sat down in a hallway that appears to be an intake area similar to a lobby. Multiple deputies were in the lobby along with several other detainees. Plaintiff did nothing aggressive or intimidating toward anyone. No security issue or crisis existed. The scene was calm, and several staff went about their business. Plaintiff sat there and waited and did nothing to justify an escalation or use of force against him.

33.     After several minutes, Defendants Kyle Penny and Tyler Piscoya, members of the Special Operations Group, entered the lobby area. Shortly after, they were joined by a third SOG Defendant, Andrew Wilson. These three SOG Defendants were dressed in green military fatigues, combat-style helmets hanging from their equipment, a variety of other militaristic weaponry, and Kel-Tec 12-gauge Shotguns. A screenshot from the surveillance footage shows one of the SOG Defendants, Defendant Tyler Piscoya:



34.     Plaintiff sat compliantly on a bench in the lobby area across from the SOG Defendants, unarmed and handcuffed. No crisis was occurring nor any basis to use force against Plaintiff.

35.     What happened next was a shocking, coordinated premeditated attack on Plaintiff by Defendants, who planned and agreed to use the shotgun concussion explosives against Plaintiff, and to physically assault him.

36.     While a nurse apparently checked Plaintiff's vitals during processing, footage captures the SOG Defendants in preparations for the coming assault. Nearly simultaneously, the SOG Defendants reached into their pockets and removed a small container of earplugs from their green uniforms. Defendant Andrew Wilson reached into his pocket first, followed by the other two SOG Defendants Penny and Piscoya, who appear to be obviously watching each other and coordinating their movements. The Defendants are all observed in the footage (which lacks audio) communicating verbally, through eye contact and expressions, and through conduct.

37.     Video shows SOG Defendant Wilson placing ear protection in his ear as the other Defendants look on:



38.     Moments later, SOG Defendant Tyler Piscoya also places protection into his ears,

following the lead of the others:



39.     The third SOG Defendant, Kyle Penny, can be observed removing and putting on a pair of black gloves during the assault preparations and appears to have an earplug in his ears.

40.     The coordination and communication among the SOG Defendants, and all the Defendants present, demonstrates a plan to assault Plaintiff using Kel-Tech Shotguns and physical violence. The SOG Defendants coordinated and conspired to assault Plaintiff, as their conduct demonstrates. Well before any use of force and while Plaintiff was sitting and being treated by a nurse, the SOG Defendants placed ear protection in their own ears—showing they knew they would soon fire the concussion explosions from the Kel-Tech Shotguns and physically assault Plaintiff. The SOG Defendants' conduct was methodical, coordinated, and premeditated.

41.     This planning and coordination by the SOG Defendants was observed by the other Defendants present, including Defendants Joseph Martinez—a supervisor on scene—as well as Defendants Recor, Channel (also a supervisor), Erickson, Coble, and Thompson. All of the Defendants observed this behavior knew what was going to transpire, pursuant to WCSO standard practices which they had experienced on many prior occasions:  the SOGs were going to use their weapons and physical violence to assault Plaintiff.

42.     Just minutes later, as the nurse concluded her assessment of Plaintiff, several Defendants searched Plaintiff and removed everything from his pockets while the SOG Defendants continued to surround Plaintiff. Defendants Wilson, Piscoya, Penny, Martinez, and Recor then escorted Plaintiff down the hallway into a small cell and out of view of the surveillance cameras, surrounded by at least five guards including the three SOG Defendants.

11

43.     Plaintiff complies with orders from deputies.  He calmly walks down the hallway to the cell.



44.     Plaintiff posed no threat to anyone, did nothing threatening or intimidating, and was in complete physical control of the Defendants during this time.

45.     These five Defendants then placed Plaintiff in a cell and ordered him face down on the floor, which Plaintiff complied with. Defendants continued preparations to assault Plaintiff.

46.     Meanwhile, back in the lobby area, Defendants Coble and Erickson knew what was about to ensue—explosions and violence—based on the communications between them and based on the routine customs and policies of the SOGs in the jail. After Plaintiff was taken into the small cell at the end of the hall, these Defendants in the lobby area began covering their own ears and looking down the hallway expectantly, waiting for the violence against Plaintiff to

commence and failing to intervene or do anything about it despite having plenty of time to intervene:



47.     The level of coordination and knowledge of the Defendants shows the attack on Plaintiff was premeditated, and that this conduct was ordinary and had been observed and participated in by Defendants before—that it was standard practice in the jail. As the footage confirms, Defendants Erickson and Coble clearly knew that the SOG Defendants would soon fire their weapons and assault Plaintiff—that is why they covered their own ears, to protect themselves from the deafening blasts. At times, the footage shows these Defendants (and other staff present) smiling and appearing to be joking about covering their ears in expectation of the assault, as if this was an ordinary but entertaining part of their daily routine.

48.     Sure enough, moments later the brutality against Plaintiff began. While Plaintiff lay face down on the ground, SOG Defendant Piscoya fired at least two concussion explosions

from his Kel-Tec Shotguns in Plaintiff's direction. On information and belief, Defendant Piscoya

acted consistent with the direction of Sergeant Martinez, a supervisor present. In the small,

confined space, the blasts generated extremely forceful and loud explosions. The blasts created a

visible flash captured in the footage from another surveillance camera closer to the entrance to

the room, as Defendants Wilson and Martinez turned away and protected their own ears and

bodies:



49.     The force of the explosions was so violent that it shook a surveillance camera in

another room and down the hallway some distance away, which is visible as the footage plays.

50.     As the Kel-Tec concussion explosions went off, the Defendants back down the

hall in the lobby—despite being some distance away (50-100 feet) — took cover in reaction to

the explosions fired at Plaintiff. The video shows the camera some distance away also violently

shook due to the force of the blasts, and at least five armed deputies covered their ears and heads

and cowered down as if to take cover for their own safety:



51.     During the time period Defendant Piscoya fired the concussion explosives, SOG Defendant Penny also smashed Plaintiff's head and face into the floor so forcefully he broke Plaintiff's glasses and caused serious injury including a large gash and a concussion. Once again, on information and belief, Defendant Penny acted consistent with the direction of Defendant Martinez, the supervisor present.

52.     Defendant Recor directly participated in and helped the assault on Plaintiff, including helping escort Plaintiff to the off-camera room, getting Plaintiff on the ground, and helping set up the assault. Defendant Recor knew from the coordination and communication between all Defendants that the physical assault on Plaintiff would occur, and knowingly participated in it. Defendant Recor also failed to intervene in and prevent the obviously unnecessary violence against Plaintiff.

53.     Defendant Andrew Wilson, a SOG deputy, also directly participated in and helped the assault on Plaintiff, including helping escort Plaintiff to the off-camera room, coordinating and communicating with SOG Defendants Penny and Piscoya, endorsing their conduct through words and conduct, providing support for the assault on Plaintiff, and knowingly participating in it. Defendant Wilson also failed to intervene in and prevent the obviously unnecessary violence against Plaintiff.

54.     Defendants Coble, Erickson, and Thompson knew the unjustified assault on Plaintiff would occur, as alleged herein and as the video evidence proves. Based on the standard practices of the SOGs they'd observed numerous times, and based on the communication and coordination between the Defendants, they knew the SOGs were going to transport Plaintiff off-camera to the small room, fire concussion explosives from the Kel-Tec shotguns, and physically assault Plaintiff. This is also proven by the conduct covering their ears in expectation of the explosions and assault, given they observed the preparation, and the conduct smiling and laughing about it. This shows knowledge, premeditation, and that the assault was standard procedure. Defendants Coble, Erickson, and Thompson failed to intervene in and prevent the clearly unjustified excessive force against Plaintiff.

55.     All the Defendants present for this violence either participated directly in the violence against Plaintiff or knew what was about to happen, agreed it would occur, and stood by and failed to intervene to prevent their fellow officers from committing an unlawful use of excessive force.

56.     According to records, Defendant Martinez, a Sergeant, was a supervisor present for and observed the assault on Plaintiff. Defendant Martinez participated in the escort of

Plaintiff to the room where the assault occurred, and on information and belief as the supervising official Defendant Martinez gave direction to Defendants Piscoya, Penny, Wilson, Recor, and the other Defendants who participated in the assault on Plaintiff. Defendant Martinez directed the SOG assault on Plaintiff and knew it would occur, and he did so pursuant to standard practice and procedure in the jail.

57.     Similarly, Defendant Channel, also a Sergeant, observed the preparation to assault Plaintiff and similarly knew what would occur and endorsed the conduct and failed to prevent it, as alleged herein and incorporated by reference.

58.     Remarkably, despite an abundance of surveillance cameras, and despite all three SOG Defendants wearing body cameras, the assault on Plaintiff was not recorded. In fact, SOG Defendants Piscoya and Penny only activated their body cameras *after* the assault on Plaintiff had concluded and Plaintiff already lay face down on the floor in a pool of blood. The conduct of the Defendants moving Plaintiff to a small room out of view of the cameras, deliberately failing to turn on their body cameras until after their assault, confirms Defendants took pains to hide their assault on Plaintiff and prevent it from being recorded. This conduct shows consciousness of guilt, premeditation, severely undermines the credibility of the Defendants' claims, and is further contrary to WCSO's own written policies. However, none of the Defendants was disciplined and the conduct was determined to be within WCSO policy and procedures, showing the misconduct is standard practice in the jail.

59.     Plaintiff was hospitalized and received eleven stitches to the large laceration on his forehead, and his left eye hemorrhaged, as shown in photos taken afterward:

 

60.     After receiving medical care at the hospital, Plaintiff was released from custody, ending the nightmare of his detention in the Weld County jail. Plaintiff suffered pain, physical injury, and severe emotional distress due to the Defendants' actions.

**Defendant Reams' Unconstitutional Policies and Procedures**

61.     The civil rights violations in this case were caused by the conduct and policies of the Defendant Reams as the Sheriff, and by Weld County. As used herein for ease of reference, the term "policy" or "policies" refers broadly and inclusively to the policies, procedures, customs, practices, training, supervision, policymaking, and decision-making of these Defendants. Defendant Reams became Sheriff of Weld County in 2014, and he is a policymaker and final decisionmaker for the County.

62.     Beginning in about 2016 and continuing to the present, Defendant Reams began to implement policies and training to turn the jail into a militarized environment in which pretrial detainees like Plaintiff, as well as inmates serving sentences, would be terrorized and brutalized.

63.     Defendant Reams, as the Sheriff of Weld County, had a non-delegable duty to ensure he implemented constitutional training and policies for WCSO. He has failed to do that knowingly and intentionally through his own conduct and decision-making, as well as through hiring and working with Joseph Garcia over a period of years to implement the Special Operations Group described herein.

64.     Joseph Garcia has heavily marketed the idea of a "Special Operations Group," a militaristic battle force similar to Army Special Forces or Navy SEALS, but with a twist:  he advocates deploying this battle force in a jail setting against pretrial detainees, and in prisons against people serving sentences. While "Special Operations" or "Special Ops" may be a commonplace idea in the military setting, Garcia has aggressively pushed the application of such militaristic tactics and weaponry in the corrections setting, including in jails with pretrial detainees like Plaintiff. Garcia advertises heavily to seek lucrative private contracts like what he's received from Weld County, and he promotes the use of various weapons, ammunition, and other products, including the Kel-Tec KSG 12-gauge shotguns used against Plaintiff in this case.

65.     Garcia (and his companies including CSAU-1 LLC) have created a large number of highly-produced videos advertising products and promoting the use of weapons and military-style tactics in the jail setting. A screenshot from one of the websites captures a sense of the tone, showing a soldier dressed in "Special Forces"-style gear and pointing a large shotgun, dressed similar to the SOG Defendants in this case:



66.     Marketing videos produced by Garcia often feature Garcia as the main character, showing him lead what appear to be "Special Forces"-style combat troops in the jail setting. The weapons used are often the same or similar to that used against Plaintiff—assault-style shotguns blasting away, as evidenced in the screenshots below taken from his videos:









67.     Garcia's videos glorify the use of explosives in the jail setting, like the concussion
explosives used against Plaintiff, as exhibited in his video productions:



68.     One action-movie style video stars Garcia as if emerging from the rubble of an

explosion:



69.     The glorification of violence, explosions, weaponry, and the use of special forces tactics in the jail setting, is utilized by Garcia, and by Defendant Reams, as a recruiting tool and training device for WCSO employees, including the Defendants in this case. The message is clear: join WCSO, and you'll get the opportunity to utilize explosives, military-style weaponry, and extreme violence against detainees and people incarcerated in jails and prisons.

70.     Joseph Garcia and his companies are of dubious and obscure origins. As of 2016, Garcia's company was known as US C-SOG and did business under a shell company called Ops Groups LLC, with its principal place of business registered in Virginia at POB 5445, Williamsburg, Virginia, 23188. According to public records and after negative media publicity regarding his controversial tactics and ideas, the company rebranded to a new acronym, CSAU-1 LLC, which apparently stands for Corrections Special Applications Unit ("CSAU-1"). For purposes of this Complaint, because Joseph Garcia is the owner and operator, references to Garcia include CSAU-1 LLC as well as its parents, predecessors, or affiliates including US C-SOG and United States Corrections—Special Operations Group. CSAU-1 LLC is registered in South Carolina.

71.     Beginning in about 2016, Defendant Reams and Weld County have paid Joseph Garcia and these companies to assist in the training WCSO staff including the Defendants, to assist in creating and implementing policies for WSCO specific to the SOGs, and to assist in creating and implementing the WCSO Special Operations Group. According to invoices, in 2016 Weld County paid Garcia and US C-SOG at least $4,000 for training WCSO deputies. In 2017, Weld County paid at least $18,700 to Garcia and US C-SOG for training he conducted in the North Jail Complex. In 2018, Weld County paid at least $18,700 to Garcia for training he

conducted for the WCSO Special Operations Group. In 2019, Weld County paid Garcia and CSAU-1 at least $25,770 for the training of WCSO Special Operations Group members.

72.     Defendant Reams and the County's decision to implement SOG policies and procedures involves a number of features which caused and were the moving force behind the constitutional violations in this case. Defendant Reams and the County are liable for their own policy decisions which independently caused Plaintiff's injuries in this case as alleged herein. But Defendant Reams and the County are also liable for the unconstitutional policies and training involving Joseph Garcia, CSAU-1 LLC, US C-SOG, and his other affiliated companies, pursuant to the County Defendants' non-delegable duties as alleged herein.

73.     First, through his own policies and also by hiring Garcia and his companies, Defendant Reams has authorized a military combat approach to pretrial detention, and has trained WCSO staff to be quick to use unreasonable violence and force. According to his own public statements, Garcia trains SOGs—including the SOG Defendants—to view pretrial detainees as "enemies" and to see it as their job to engage in "combat" and "fight" so-called "enemies" i.e. detainees. He trained WCSO staff to view their jobs as "going to battle with" detainees, and to see themselves as "warriors" against them. Garcia trained and advocated WCSO staff to use intimidation, harassment, aggression, threats of violence, physical violence, and weaponry, to terrify pretrial detainees and other inmates in the jail.

74.     Second, through his own policies and also by hiring Garcia and his companies, Defendant Reams has authorized WCSO staff to use weapons unnecessarily and unreasonably against pretrial detainees like Plaintiff, specifically including the Kel-Tec Shotgun and the concussion explosion rounds used against Plaintiff. Other weaponry endorsed by Defendant

Reams, assisted by Garcia, include:  hard rubber bullets capable of causing permanent injury; concussion grenades and explosives; sniper-style laser sights; military-style helmets and vests; green and tan Army-style uniforms; and a variety of other militaristic weaponry.

75.     Demonstrating the violence of his tactics, Garcia claims to have gotten the idea to use army green and tan uniforms for his SOGs in the pretrial detention setting in order to more easily see blood and other bodily fluids when used during his so-called "combat" operations against pretrial detainees. Moreover, a key purpose of the Army Special Forces appearance of the SOGs is to intimidate and terrorize pretrial detainees under the constant threat of this kind of brutality and violence.

76.     As Defendant Reams knew, the Kel-Tec Shotguns used against Plaintiff are marketed by Garcia as "battle proven" and "combat ready" for use in the pretrial detention setting. The Kel-Tec Shotguns are advertised by Garcia as "The Official Weapons Platform of US C-SOG," one of Garcia's shell companies that Defendant Reams paid to help train his employees.

77.     Third, through his own policies and also by hiring Garcia and his companies, Defendant Reams has authorized and endorsed training of WCSO staff to use physical violence including "combat" style tactics and simply assaulting detainees violently, including strikes to the head—exactly as Defendants used against Plaintiff in this case.

78.     Fourth, Defendant Reams, through his own policy decisions as well as by hiring Garcia and his companies, authorized and implemented a custom which amounts to an official policy of SOGs to constantly terrorizing pretrial detainees in the jail. Under Defendant Reams SOG policies and procedures, all pretrial detainees are guarded at gunpoint by SOGs patrolling

with their shotguns and military-style armor, as described herein. At least two SOGs patrol the jail constantly for the specific purpose, pursuant to Defendant Reams' authorization, of terrorizing detainees through their display of weaponry, aggression, and violence.

79.    Fifth, Defendant Reams created secret policies and procedures for WCSO which he has refused to disclose for the Special Operations Group Defendants. According to WCSO Detentions Policy 523.2.3 which regards the Special Operations Group, certain "operational procedures should be patterned after the US C-SOG Suggested SOG Best Practices," referring to the training of Joseph Garcia and one of his companies, US C-SOG. Weld County and the Sheriff have refused to disclose this secret training manual in response to Plaintiff's records requests.

80.    Joseph Garcia strives to keep his unconstitutional training and policies secretive, as evidenced by public statements falsely claiming his practices are "classified," when in fact they involve matters of grave public concern. However, aspects of his training have been leaked publicly. According to jail staff in New York who participated in trainings conducted by Garcia, his motto during training is: "Break the jaw and walk away." Garcia's training involves combat techniques including eye gouges and strikes to the head—exactly as occurred to Plaintiff, who was struck in the head and had his face smashed into the floor. Reports from participants in Garcia's training confirm that he promoted combat techniques in the jail setting, contrary to written policies.

81.    Garcia claims to lead a nationwide cohort of Special Operations Group operatives located in regional jails and prisons, apparently to include WCSO and the jail in this case. Although a private contractor and product marketer, he presents himself as a pseudo-military

character, and calls himself "Senior Team Leader Garcia" or "STL Garcia" and the leader and policymaker for his companies and the Special Operations Group cohort.

82.     According to publicly available information and based on information and belief, Joseph Garcia lacks the qualifications to train WCSO jail staff or assist in implementing policies for WCSO. Garcia appears to lack certifications, licenses, or expertise. Defendant Reams knew, and any reasonable officer or Sheriff would know, Garcia is unqualified to train staff and help implement policies for a County or a jail, that his training and tactics are unconstitutional, and will result in violations of civil rights as has occurred against Plaintiff.

83.     Defendant Reams' training and policies are contrary to appropriate policies and procedures in a pretrial detention setting, they violate best practices, violate minimal standards for the pretrial detention setting, and violate the Constitution as alleged herein. These policies and training lead directly to civil rights violations as occurred in this case. Defendant Reams endorsed the use of concussion explosion rounds and excessive force, as used against Plaintiff in this case, despite it being contrary to how that weapon should be used, he has endorsed the use of Kel-Tec Shotguns unlawfully, he has endorsed the use of excessive force precipitously against detainees, and has endorsed the use of this weaponry on a daily and routine basis in his jail, despite it being unreasonable and contrary to the Constitution.

### Defendant Reams' and Weld County's Customs Constituting Policies

84.     As the Sheriff, Defendant Reams is responsible for the policies of WCSO and the County, including the training and policies he jointly endorsed and has contracted for on a continuing basis from Joseph Garcia and his companies. One way in which Defendant Reams has implemented an unconstitutional custom amounting to official policy is through the daily,

routine use of SOGs and their weaponry and excessive force as alleged herein, which itself

violates even the written policies of the WCSO as well as the Constitution.

85.     The official WCSO policy 523.1.2 states that SOGs should only be used "to

resolve critical incidents that are so hazardous, complex or unusual that they exceed the

capabilities of Detention Deputies to handle safely. This includes, but is not limited to, hostage

taking, barricaded suspects, and other high-risk incidents."

86.     However, Defendant Reams has implemented and endorsed a custom that

amounts to an official policy of violating WCSO written procedures. In custom and practice, as

alleged herein, SOGs patrol the jail constantly and do not only respond to "critical" or especially

hazardous incidents. Violating that written policy, as in this case, SOGs have a custom to

routinely terrorize and brutalize people in pretrial detention who are unarmed, not violent, and

where no crisis exists at all. In fact, in this case multiple regular deputies interacted with

Plaintiff, had escorted Plaintiff, and were present with the SOGs as the group assaulted Plaintiff.

There was nothing unusual or critical about Plaintiff's situation necessitating SOGs or any use of

force, and their conduct and utilization in this case was plainly excessive and unconstitutional as

alleged herein. The routine, daily presence and conduct of the SOGs in the jail clearly amounts to

a custom that constitutes official policy and the standard operating procedure for Weld County

jail, in violation of their own rules.

87.     Similarly, it is written WCSO policy for SOGs that "[t]he safety of citizens both

inside and outside the facility is paramount." Policy 523.2. However, this policy is routinely

violated as described herein, amounting to a custom and official policy that violates WCSO

written rules and is unconstitutional. To the contrary, the policies of Defendant Reams, including

the Special Operations Group, undermine the safety and well-being of pretrial detainees on a daily basis, and cause injuries including as those described against Plaintiff herein.

**Pattern and Custom of Civil Rights Violations**

88.　　Contrary to its written policies and what the Constitution requires, a pattern and practice of excessive force has existed in the jail that amounts to a de facto official policy sanctioned by the Sheriff and the County. These customs and unwritten policies were also the cause of the violations against Plaintiff in this case. These policies and customs of excessive force extend to all WCSO deputies and officials, not just the Special Operations Group members, although the SOGs are often participants in this violence.

89.　　As an initial matter, the facts of what occurred alone demonstrate unconstitutional policies and procedures caused the violations alleged. As alleged herein, the Defendants' conduct shows coordination, communication, premeditation, and agreement by at least eight WCSO staff, including two supervisors (Defendants Martinez and Channel), to unjustifiably assault Plaintiff. Over a period of time, video evidence shows the Defendants planned and coordinated their assault, communicating verbally and non-verbally (i.e. by placing ear protection in their ears to indicate shotgun blasts and violence were coming, as alleged herein). Defendants joked and smiled about the violence, clearly talking amongst themselves about the violence prior to its occurrence. They then systematically and deliberately transported Plaintiff off-camera and intentionally did ***not*** activate their body cameras, to assault Plaintiff in a secretive manner, showing consciousness of their own guilty conduct. The conduct of the Defendants as alleged herein evinces it was standard operating procedure in the facility amounting to an official policy and pursuant to their training and supervision—an ordinary part of their day, like any other.

90.     Multiple individuals, including pretrial detainees, former inmates, and individuals who visit the jail frequently, report conduct by the WCSO Special Operations Group consistent with that described in this Complaint. It is well-known and observed by anyone who spends time in the Weld County jail that the conduct against Plaintiff in this case is typical of the deputies in the WCSO, and particularly the WCSO Special Operations Group.

91.     Multiple individuals confirm that over a period of years including the time period in which Plaintiff was harmed, the SOGs in the jail have not been used for critical responses, but instead constantly patrol the jail in groups of at least two. The SOGs dress in their military-style fatigues, carry a variety of weapons including the assault-style Kel-Tec Shotguns used against Plaintiff, and through these weapons and their appearance and conduct—as well as physical violence—they rove about the jail and intimidate, terrorize, and brutalize detainees.

92.     The Kel-Tec Shotguns used by WCSO, per the training implemented by Defendant Reams, are capable of firing a variety of ammunition. The Shotguns can simultaneously hold concussion explosives of the sort used against Plaintiff in this case, as well as hard rubber bullets which can severely injure detainees. SOGs can toggle back and forth between the concussion explosive rounds and the rubber bullets.

93.     In the time period leading up to and including the incident alleged herein, the SOGs used Kel-Tec Shotguns on a daily basis, including the use of the "concussion explosives" used against Plaintiff. Frequently, SOGs fired hard rubber bullets from the Kel-Tec Shotguns. The weapons are constantly brandished and pointed without justification to terrorize people. What occurred to Plaintiff is far from abnormal—it is the norm and custom in Weld County jail.

94.     Public reports of excessive force against detainees include an incident in October of 2017 where SOGs fired shotgun blasts at an inmate at least seven times, a civil rights violation that public reports indicate has triggered an inquiry by federal authorities. Similarly, authorities reportedly opened an inquiry into the use of a shotgun by SOGs against another inmate, also in 2017, in the jail.

95.     In 2018, without justification SOGs in the jail fired a rubber bullet at an individual using a Kel-Tec Shotgun, putting a hole in the man's leg muscle and causing extensive and permanent injury, including to his feeling and mobility.

96.     SOGs in WCSO have fired concussion explosions from their Kel-Tec Shotguns on a near-daily basis, often several times daily, including against nonthreatening detainees and inmates who, like Plaintiff, did nothing to justify this use of force, following the training authorized by Defendant Reams.

97.     SOGS in WCSO—as well as regular deputies—also turn to physical violence and combat techniques precipitously and without justification, including head strikes as used against Plaintiff in this case, following the training implemented by Defendant Reams.

98.     Pre-discovery investigation has uncovered numerous other instances of unjustified violence by SOGs, amounting to standard procedure.

        a.   Former detainee Phillip Romero describes SOGs utilizing their shotguns to intimidate detainees from 2017-2019 in the jail, brandishing and "cocking" the guns to terrorize detainees, without justification;

        b.   In approximately 2019, former detainee Phillip Romero was tasered by SOGs while alone in his cell;

c.  In 2017, former detainee Jeremy Whitewolf was shot multiple times with projectiles by SOGs using the Kel-Tec shotguns and tasered, without justification;

d.  In 2017, Nicholas Hozeska was shot by SOGs while in WCSO;

e.  In 2017-2018, former detainee Contrarez was shot in the leg with projectiles by SOGs, without justification, causing a significant wound in his leg;

f.  In 2018-2019, Ernest Fuentes was shot approximately five times without justification by Weld SOGs believed to be utilizing Kel-Tec shotgun projectiles, causing injury and scarring;

g.  In 2018, former detainee Samuel Duran was shot approximately five times in the torso by SOGs believed to be using Kel-Tech shotgun projectiles, without justification and causing injury;

h.  In 2018, former detainee Nicholas Hall was shot in the leg with a "military grade shotgun."  The shooting occurred after Mr. Hall refused to put on a pair of pants issued to him that were too small for him to wear. Mr. Hall was in a submissive position with his back to the officer when he was shot at close range.  Mr. Hall suffered extensive nerve and tissue damage, causing him to lose feeling and mobility in two of his toes and permanent scarring.

99.     Detainees report other incidents of apparent sadism and unlawful excessive force involving SOGS, further showing the conduct alleged herein was standard procedure and pursuant to the Sheriff's training and supervision. For instance, in approximately 2018 detainee Nicholas Bateman, while at WCSO jail, observed a WCSO contractor on information and belief

identified as Joseph Garcia conduct an operation in a unit.  One day while in lock-down in a medium security unit, all of the guards poured into the unit like troopers, yelling at everyone to put their hands against the wall.  The contractor believed to be Joseph Garcia was with the guards and had a jet-black attack dog with a camera on its back. (Investigation of Mr. Garcia corroborates his use of dogs as part of SOG operations, and that he promotes technology including cameras mounted on dogs, along with the Kel-Tec shotguns as described herein). The SOGs terrorized the unit, standing on tables, ordering the detainees out in a single-file line and walking them, with shotguns and the dog, down against a wall with their hands on their heads. The guards put the inmates against the wall and took photos of themselves standing together like soldiers with the inmates huddled up and afraid. After taking the photo, all the inmates were told to go back into their units. The SOGs and some others who appeared to be in training by the consultant, wore tactical gear, consistent with that described herein. No justification supported the incident, which appears to have been conducted to terrorize the detainees and use them as guinea pigs.

100.    Further demonstrating the sadistic, pervasive culture of violence and brutality tolerated and endorsed in the facility, in approximately 2018 multiple witnesses including Mr. Bateman observed a photograph used as a screensaver on an officer's computer visible to the inmates.  The screensaver was a photo of men in the WCSO in solitary confinement, wearing only their boxer shorts and cowering while an officer wearing tactical gear and carrying the SOG shotgun stood near the men in boxers.  Mr. Bateman described the photo as appearing to mimic notorious photographs of sadistic treatment of detainees in Abu Ghraib prison during the war in

Iraq in 2003-2004.  The screensaver photo shows the behavior was accepted as standard procedure in the facility.

101.    The use of force against Plaintiff therefore was directly caused by not only the official training, policies, and procedures of Defendant Reams as alleged herein, but further by the unwritten yet routine policies and customs of excessive force and ongoing civil rights violations against detainees. These include without limitation the unlawful use of shotguns including brandishing, menacing, pointing, and firing the weapons without justification; unlawful use of physical force, like the head strike that smashed Plaintiff's face into the floor, causing injuries; the unlawful use of concussion explosions to terrorize and harm detainees, as was used against Plaintiff herein; the shocking and unreasonable militarization of the jail setting for the specific purpose of terrorizing and brutalizing detainees and inmates, as described herein.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**42 U.S.C. § 1983—Fourth and Fourteenth Amendment Violations**
**Excessive Force—Individual Liability**
**(Against Defendants Channel, Martinez, Thompson, Recor, Penny, Piscoya, Wilson, Coble, Erickson)**

102.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

103.    42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person with the jurisdiction thereof to the deprivation of any rights, privileges, immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

104.    Plaintiff is a citizen of the United States and the entity and individual and official capacity Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

105.    At all times relevant to this action, Defendants were acting under color of state law in their actions and inaction.

106.    At all times relevant, Plaintiff was a pretrial detainee, neither convicted of any crime nor sentenced to any punishment, protected by the due process clause of the Fourteenth Amendment as well as the Fourth Amendment to the United States Constitution. Plaintiff had a clearly established right to safety and well-being, and to be protected from excessive force and deprivations of due process.

107.    At all times relevant, Plaintiff had a clearly established constitutional right as a pretrial detainee to be secure in his person from unreasonable excessive force.

108.    Defendants' use of excessive force was objectively unreasonable, not rationally related to a legitimate government objective, and excessive in relation to any legitimate objective.[1] Defendants also knew of Plaintiff's clearly established constitutional rights as a pretrial detainee and knew their conduct violated clearly established law.

---

[1] Plaintiff alleges for all § 1983 claims herein that Defendants are liable under both an objective and subject standard of liability, although Plaintiff will contend that an objective standard should apply to all claims because Plaintiff was a pretrial detainee. *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015) (objective standard applies in pretrial detainee context); *Perry v. Durborow*, 892 F.3d 1116, 1122 n.1 (10th Cir. 2018) (noting "we question" whether the subjective standard should apply to pretrial detainee following *Kingsley*); *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (holding object standard proper, "we are persuaded that *Kingsley* applies, as well, to failure-to-protect claims brought by pretrial detainees against individual defendants under the Fourteenth Amendment."); *Gordon v. County of Orange*, 888 F.3d 1118 (9th Cir. 2018); *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017) (following *Kingsley* to apply objective reasonableness standard to deliberate indifference claim in pretrial detainee context); *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) (following

36

109.     Defendants' actions and inactions deprived Plaintiff of his Constitutional right to be free from excessive force as a pretrial detainee.

110.     Defendants intentionally, knowingly, recklessly, and willfully and wantonly used excessive force against Plaintiff, knowing he would suffer severe pain and suffering as a result of their actions.

111.     Defendants also intentionally, knowingly, recklessly, and willfully and wantonly failed to intervene in and prevent their fellow Defendants' unlawful excessive force against Plaintiff, knowing he would suffer severe pain and suffering as a result of their inaction.

112.     Defendants Martinez and Channel are liable both for their direct participation in the use of excessive force, as well as under a supervisory liability theory, as Sergeants overseeing, directing, endorsing, and failing to prevent the unlawful conduct of the other Defendants, which also caused such conduct of the other Defendants.

113.     Any reasonable law enforcement officer would know this conduct violated clearly established law. Any reasonable law enforcement officer would know Plaintiff had a clearly established right to be free from this use of excessive force.

114.     Defendants engaged in a use of force that was objectively unreasonable in light of the circumstances facing them, in which Plaintiff posed no threat to the Defendants, violating Plaintiff's Fourth and Fourteenth Amendment rights.

115.     The Defendants' conduct was without penological purpose or justification and was motivated by intent to harm Plaintiff, and their actions and inactions as described herein

_____

*Kingsley* to apply objective unreasonableness standard to deliberate indifference claim in pretrial detention context).

were undertaken intentionally, maliciously, wantonly, and/or in reckless disregard of Plaintiff's constitutionally protected rights.

116.     None of the Defendants took reasonable steps to intervene or protect Plaintiff from the objectively unreasonable use of force of the other Defendants despite being in a position to do so, and each is therefore liable for the damages resulting from the objectively unreasonable force used by others.

117.     The acts and omissions of the Defendants were the legal and proximate cause and the moving force behind of Plaintiff's damages.

118.     The Defendants had a non-delegable duty to follow the Constitution and to not violate Plaintiff's right to be free from excessive force as a pretrial detainee.

119.     Plaintiff is entitled to and will seek punitive damages against these Defendants in that their actions were taken maliciously, willfully, or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

120.     Plaintiff is entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988, including prejudgment interests and costs as allowable by federal law.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983—Fourth and Fourteenth Amendment Violations**
**Excessive Force—Supervisory and Individual Liability**
**(Against Defendant Steve Reams in his individual capacity)**

121.     Plaintiff incorporates all other paragraphs of this Complaint as if fully stated herein.

122.     At all times relevant to this action, Defendant Reams was acting under color of state law in his actions and inaction as the Sheriff of Weld County.

123.    Defendants Reams is sued in his individual capacity for individual as well as supervisory individual liability because he subjectively and personally implemented, supervised, and knew about the unconstitutional policies, procedures, training, customs, and conduct of the other Defendants and occurring inside the jail on a daily basis and against Plaintiff; he created, ratified, and implemented the unconstitutional training, policies and procedures; and his conduct is affirmatively linked to Plaintiff's injuries. Any objectively reasonable officer in Defendant Reams' position would have known his action and inaction violated Plaintiffs' constitutional rights.

124.    Defendant Reams directly participated in and knew about, encouraged, sanctioned, approved, and consented to the unconstitutional conduct of the other individual Defendants, as described herein and incorporated by reference, directly causing Plaintiff's damages.

125.    Defendants Reams knew of Plaintiff's clearly established constitutional rights to safety as a pretrial detainee and to be free from the unlawful use of excessive force, and knew that his and the other Defendants' conduct, action, and inaction violated clearly established constitutional law; and, any objectively reasonable law enforcement officer would have known of this clearly established law.

126.    Defendant Reams' knowing, deliberate decisions led directly to violation of Plaintiff's Fourth and Fourteenth Amendment rights.

127.    The acts or omissions of Defendants Reams were the legal and proximate cause and the moving force behind Plaintiffs injury and damages, and Plaintiff endured severe pain and suffering as a result of Defendant Reams' action and inaction.

128.    The actions and inaction of Defendant Reams led to Plaintiff's injuries and fell within the scope of his official duties and employment.

129.    Plaintiff is entitled to and will seek punitive damages against Defendants Reams in that his actions were taken maliciously, willfully, or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

130.    Plaintiff is entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988, including prejudgment interests and costs as allowable by federal law.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983—Fourth and Fourteenth Amendment Violations—*Monell* Liability**
**(Against Defendants Steve Reams in his official capacity and the Board of County Commissioners of Weld County)**

131.    Plaintiff incorporates all other paragraphs of this Complaint as if fully stated herein.

132.    Defendants Reams and Weld County ("County Defendants"), at all times relevant, were acting under color of state law in their actions and inaction.

133.    The County Defendants are liable for the unconstitutional policies, procedures, training, supervision, customs, and practices described herein, which led to Plaintiff's injuries.

134.    The County Defendants are also subject to non-delegable liability for the unconstitutional policies, procedures, training, supervision, customs, and practices of its agents, employees, and contractors, including without limitation Joseph Garcia, CSAU-1 LLC, US C-SOG, and any agents or affiliates, which led to Plaintiff's injuries.

135.    As a result of the allegations contained in this Complaint, the County Defendants are liable under 42 U.S.C. § 1983 for maintaining unconstitutional as well as deliberately

indifferent policies, customs, procedures, decision-making, and training that resulted in the violation of Plaintiff's Fourth and Fourteenth Amendment rights, including his right to be free from the use of excessive force and his right to due process.

136.    The County Defendants knew that these policies, customs, procedures, decision-making, and training were unconstitutional and would result in unconstitutional conduct as occurred in this case. The use of force arose under circumstances that constitute a usual and recurring situation officers deal with on daily basis. Nevertheless, the County Defendants failed to take reasonable steps to alleviate those substantial risks. There is an affirmative causal link between the conduct of the individual Defendants in this case towards Plaintiff's protected rights and the policies, procedures, customs, decision-making, and training described herein, which were also the moving force behind the Defendants' unconstitutional conduct and the moving force resulting in Plaintiffs' injuries and damages.

137.    The County Defendants are liable under 42 U.S.C. § 1983 for use of excessive force and substantive due process violations by the individual Defendants as described herein, Defendant Reams as described herein, CSAU-1 LLC, US C-SOG, Joseph Garcia and their agents and affiliates as described herein, and other employees and agents yet to be identified.

138.    The unconstitutional acts and omissions of the County Defendants were the moving force in the unconstitutional acts of the individual defendants, and the moving force resulting in the injuries and damages suffered by Plaintiff.

139.    As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff has suffered injuries and losses entitling him to recover compensatory and special damages,

including for extreme physical pain and suffering, loss of constitutional rights, emotional

distress, and other damages, all in amounts to be proven at trial.

140.    Plaintiff is entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988,

including prejudgment interests and costs as allowable by federal law.

### FOURTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983—Fourteenth Amendment Substantive Due Process Violation
### (All Individual Defendants)

141.    Plaintiff incorporates all other paragraphs of this Complaint as if fully stated

herein.

142.    Defendants acted under color of state law in their actions and inaction as alleged

herein.

143.    The Fourteenth Amendment to the United State Constitution protects fundamental

liberty interests including the right to a sense of security and individual dignity, and protects

against arbitrary and oppressive abuses of power by those acting under color of state law.

144.    Defendants' conduct of deploying routinely and against Plaintiff the Special

Operations Group, a militarized combat force, dressed in battle fatigues, vests, and helmets, and

carrying military-style shotguns, and firing concussion explosives in his direction and violently

assaulting Plaintiff, constituted arbitrary and oppressive conduct, was not rationally related to a

legitimate government objective or was excessive in relation to that purpose, and violated the

rights guaranteed to Plaintiff by the due process clause of the Fourteenth Amendment to the

Constitution.

145.    Defendant's conduct constituted unlawful punishment of Plaintiff as a pretrial

detainee not convicted of any crime.

146.     Defendants' conduct was objectively unreasonable as any objectively reasonable officer would know and violated clearly established constitutional law.

147.     Defendants conduct also shocks the conscience and interferes with fundamental rights implicit in the concept of ordered liberty and is offensive to human dignity.

148.     As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff suffered injuries and losses entitling him to recover compensatory and special damages, including for extreme physical pain and suffering, loss of constitutional rights, emotional distress, and other damages, all in amounts to be proven at trial.

149.     Plaintiff is entitled to and will seek punitive damages against Defendants as permitted by law, in that their actions were taken maliciously, willfully, or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

150.     Plaintiff is entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988, including prejudgment interests and costs as allowable by federal law.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against the Defendants, and award him all relief as allowed by law and equity, including, but not limited to the following:

    a.   Declaratory and injunctive relief, as appropriate;

    b.   Actual economic damages as established at trial;

    c.   Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, medical bills, and other pecuniary and non-pecuniary losses;

43

d.  Punitive damages for all federal claims as allowed by law in an amount to be

determined at trial;

e.  Issuance of an Order mandating appropriate equitable relief, including but not

limited to ordering a formal written apology from each Defendant to Plaintiff;

f.  Pre-judgment and post-judgment interest at the highest lawful rate;

g.  Attorney fees and costs; and

h.  Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 27th day of July, 2020.

Respectfully submitted,

*s/ David G. Maxted*
David G. Maxted, #52300
MAXTED LAW LLC
1543 Champa Street, Suite 400
Denver, CO  80202
dave@maxtedlaw.com
720.717.0877

*s/ Kathryn J. Stimson*
Kathryn J. Stimson, #36783
STIMSON STANCIL LABRANCHE HUBBARD, LLC
1652 Downing Street
Denver, CO 80218
Tel./Fax: 720.689.8909

*Attorneys for Tage Rustgi*

44