**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 20-cv-0945-WJM-STV

TAGE RUSTGI,

      Plaintiff,

v.

STEVE REAMS, in his individual and official capacities,
MICHAEL RECOR, in his individual capacity,
TYLER PISCOYA, in his individual capacity,
CORY CHANNEL, in his individual capacity,
JOSEPH MARTINEZ, in his individual capacity,
MICHAEL THOMPSON, in his individual capacity,
KYLE PENNY, in his individual capacity,
ANDREW WILSON, in his individual capacity,
SAVANNAH COBLE, in her individual capacity,
ANNA ERICKSON, in her individual capacity,
BOARD OF COUNTY COMMISSIONERS OF COUNTY OF WELD, COLORADO,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO
DISMISS PLAINTIFF'S AMENDED COMPLAINT AND JURY DEMAND, AND
DENYING DEFENDANTS' MOTION IN THE ALTERNATIVE TO BIFURCATE
DISCOVERY AND TRIAL**

---

      Before the Court are: (1) Defendants'[1] Motion to Dismiss Plaintiff Tage Rustgi's

---

[1] Defendants named in the First Amended Complaint ("FAC") (ECF No. 50) are: Steve Reams, Michael Recor, Tyler Piscoya, Corey Channel, Joseph Martinez, Michael Thompson, Kyle Penny, Andrew Wilson, Savannah Coble, Anna Erickson, and Board of County Commissioners of County of Weld, Colorado. The Court refers to these defendants collectively as "Defendants." The Court refers to the Board of County Commissioners of County of Weld, Colorado as the "BOCC."

      In Rustgi's response, he states that his counsel "conferred with the defense and proposed a voluntarily stipulated dismissal of Defendant Michael Thompson, under certain terms, which the defense is currently considering. With permission of the defense, Plaintiff therefore does not address Thompson herein and reserves the right to supplement should no

Amended Complaint ("Motion to Dismiss") (ECF No. 56); and Defendants' Motion in the Alternative to Bifurcate Discovery and Trial ("Motion to Bifurcate") (ECF No. 44). For the following reasons, the Motion to Dismiss is granted in part and denied in part, and the Motion to Bifurcate is denied.

## I. BACKGROUND

The following factual summary is drawn from Rustgi's FAC (ECF No. 50),[2] except where otherwise stated. The Court assumes the allegations in the FAC are true for the purposes of deciding the Motion to Dismiss. *See Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

### A. Sheriff Reams's Policies and Procedures

Rustgi alleges that beginning in 2016, Sheriff Reams, a policymaker and final decisionmaker for the Weld County Sheriff's Office ("WCSO") and Weld County, began implementing policies and training to turn the Jail into a militarized environment in which pretrial detainees like Rustgi, as well as inmates, "would be terrorized and brutalized." (¶ 62.) Sheriff Reams hired Joseph Garcia, a contractor who has promoted the use of unconventional militaristic "Special Forces" tactics and weaponry in the jail setting which he calls a Special Operations Group ("SOG"). (¶¶ 4, 64.)

Garcia markets Kel-Tec KSG 12-gauge Shotguns ("Kel-Tec Shotguns")—the same weapon used on Plaintiff—and provides training, supervision, and policy advice to the WCSO. (¶ 4.) The SOG functions as a militarized combat force trained to intimidate, terrorize, and brutalize people detained in the Jail. (¶ 5.) Sheriff Reams

---

dismissal agreement be reached." (ECF No. 70 at 7 n.4.) Based on this statement, the Court does not address allegations related to Defendant Thompson.

[2] Citations to (¶ __), without more, are references to the FAC. (ECF No. 50.)

allegedly trains and authorizes deputies to use Kel-Tec Shotguns, which can fire live ammunition, concussion explosions, and rubber bullets capable of putting a hole in a person's leg. (*Id.*)

## B. The Alleged Assault on Rustgi at the Jail

While a college student at the University of Colorado in Boulder, Rustgi returned to his home in Weld County for the Greeley Stampede on June 23, 2018. (¶ 30.) At some point that evening, Rustgi was placed in a detox hold, though no criminal charges were filed against him arising from the events of the day. (¶ 31.) He was transferred to the Weld County North Jail Complex ("Jail") and detained for "unclear reasons." (*Id.*) Rustgi was brought to the Jail in handcuffs and seated in a hallway near a lobby. (¶ 32.) He alleges he did nothing "aggressive" or "intimidating" and that no security issue or crisis existed. (*Id.*) Rather, the scene was calm, and Rustgi sat and waited. (*Id.*)

Minutes later, Penny and Piscoya, members of the SOG, an allegedly "violent, militarized group of deputies," entered the lobby area, dressed in green military fatigues and combat-style helmets, carrying militaristic weaponry and Kel-Tec 12-gauge Shotguns. (¶ 33.) Rustgi alleges that while a nurse checked his vitals, Penny, Piscoya, and Wilson put in earplugs. (¶¶ 36–39.) Allegedly, they also communicated via eye contact, expressions, and conduct; this coordination and communication allegedly demonstrates "a plan to assault Plaintiff using Kel-Tech [*sic*] Shotguns and physical violence." (¶ 39.) In addition, Rustgi alleges the planning and coordination by the SOG Defendants[3] was observed by other Defendants present, including Martinez (a supervisor), Recor, Channel (another supervisor), Erickson, Coble, and Thompson, and

---

[3] It is not clearly alleged which Defendants are the "SOG Defendants."

they all allegedly knew the SOGs were going to use their weapons and physical violence to assault Rustgi.  (¶ 41.)

Wilson, Piscoya, Penny, Martinez, and Recor escorted Rustgi down the hall and into a small cell out of the view of surveillance cameras.  (¶ 42.)  Rustgi alleges he complied with orders from deputies, posed no threat to anyone, did nothing threatening or intimidating, and was in Defendants' complete physical control during this time.  (¶¶ 43–44.)  The five Defendants ordered Rustgi to lay face down on the floor, which he did.  (¶ 45.)

Meanwhile, Rustgi alleges that in the lobby area, Defendants Coble and Erickson knew what was about to ensue—explosions and violence—based on the communications between them and the routine customs and policies of the SOGs in the Jail.  (¶ 46.)  Coble, Erickson, and other staff present joked about covering their ears in expectation of the assault.  (¶ 47.)

In the cell, while Rustgi lay face down on the floor, Piscoya fired at least two concussion explosions from his Kel-Tec Shotguns in Rustgi's direction; the blasts generated "extremely forceful and loud explosions" and "created a visible flash."  (¶ 48.)  Rustgi alleges Piscoya acted "consistent with the direction of Sergeant Martinez, a supervisor present."  (*Id.*)  Surveillance footage shows the camera shook, and people in the lobby covered their ears and heads and cowered to protect themselves.  (¶ 50.)

Rustgi alleges the individual Defendants present and those in the hallway took certain actions contributing to his assault, including:

- During the time period when Piscoya fired the concussion explosives, Penny also "smashed Plaintiff's head and face into the floor so forcefully he broke Plaintiff's glasses and caused serious injury including a large gash and a concussion." (¶ 51.)  Rustgi alleges Penny "acted consistent

4

with the direction of Defendant Martinez, the supervisor present." (*Id.*)

- Recor "directly participated in and helped the assault on Plaintiff, including helping escort Plaintiff to the off-camera room, getting Plaintiff on the ground, and helping set up the assault. Defendant Recor knew from the coordination and communication between all Defendants that the physical assault on Plaintiff would occur, and knowingly participated in it. Defendant Recor also failed to intervene in and prevent the obviously unnecessary violence against Plaintiff." (¶ 52.)

- "Defendant Andrew Wilson, a SOG deputy, also directly participated in and helped the assault on Plaintiff, including helping escort Plaintiff to the off-camera room, coordinating and communicating with SOG Defendants Penny and Piscoya, endorsing their conduct through words and conduct, providing support for the assault on Plaintiff, and knowingly participating in it. Defendant Wilson also failed to intervene in and prevent the obviously unnecessary violence against Plaintiff." (¶ 53.)

- "Defendants Coble, Erickson, and Thompson knew the unjustified assault on Plaintiff would occur, as alleged herein and as the video evidence proves. Based on the standard practices of the SOGs they'd observed numerous times, and based on the communication and coordination between the Defendants, they knew the SOGs were going to transport Plaintiff off-camera to the small room, fire concussion explosives from the Kel-Tec shotguns, and physically assault Plaintiff. This is also proven by the conduct covering their ears in expectation of the explosions and assault, given they observed the preparation, and the conduct smiling and laughing about it. This shows knowledge, premeditation, and that the assault was standard procedure. Defendants Coble, Erickson, and Thompson failed to intervene in and prevent the clearly unjustified excessive force against Plaintiff." (¶ 54.)

- "According to records, Defendant Martinez, a Sergeant, was a supervisor present for and observed the assault on Plaintiff. Defendant Martinez participated in the escort of Plaintiff to the room where the assault occurred, and on information and belief as the supervising official Defendant Martinez gave direction to Defendants Piscoya, Penny, Wilson, Recor, and the other Defendants who participated in the assault on Plaintiff. Defendant Martinez directed the SOG assault on Plaintiff and knew it would occur, and he did so pursuant to standard practice and procedure in the jail." (¶ 56.)

- "Similarly, Defendant Channel, also a Sergeant, observed the preparation to assault Plaintiff and similarly knew what would occur and endorsed the conduct and failed to prevent it, as alleged herein and incorporated by reference." (¶ 57.)

As a result of the assault, Rustgi was hospitalized and received eleven stitches to the laceration on his forehead, and his left eye hemorrhaged. (¶ 59.) After receiving medical care at the hospital, Rustgi was released from custody. (¶ 60.)

## C.    Procedural History

Rustgi filed this action on April 3, 2020 (ECF No. 1) and filed the FAC on July 27, 2020 (ECF No. 50). He brings four claims under 42 U.S.C. § 1983, including: (1) Individual liability claims under the Fourth and Fourteenth Amendment violations for excessive force against Channel, Martinez, Thompson, Recor, Penny, Piscoya, Wilson, Coble, Erickson in their individual capacities; (2) Fourth and Fourteenth Amendment violations for excessive force—both supervisory and individual liability—against Sheriff Reams in his individual capacity; (3) Fourth and Fourteenth Amendment violations— *Monell* liability—against Sheriff Reams in his official capacity and the Board of County Commissioners of Weld County ("BOCC"); and (4) Fourteenth Amendment substantive due process violation against all Individual Defendants.

On July 6, 2020, Defendants filed the Motion to Bifurcate. (ECF No. 44.) Rustgi filed a response in opposition (ECF No. 51), to which Defendants replied (ECF No. 58).

On August 10, 2020, Defendants filed the Motion to Dismiss. (ECF No. 56.) Rustgi filed a response in opposition (ECF No. 70), to which Defendants replied (ECF No. 75).

## II. ANALYSIS

## A.    Motion to Dismiss

### 1.    Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a

claim in a complaint for "failure to state a claim upon which relief can be granted." "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (internal quotation marks omitted).

The Rule 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff." *Ridge at Red Hawk*, 493 F.3d at 1177. Thus, in ruling on a Motion to Dismiss under Rule 12(b)(6), the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted). "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). However, "[t]he burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). "[C]omplaints that are no more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,' . . . 'will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at

555).

2. <u>Analysis</u>

a. *Consideration of Weld County Jail Surveillance Video*

Well-settled authority provides that the Court "may consider a document outside the pleadings, even in a Rule 12(b)(6) analysis, if the document is (1) mentioned in the complaint, (2) central to the claims at issue, and (3) not challenged as inauthentic." *Ramirez v. Hotel Equities Grp., LLC*, 2019 WL 5964968, at *1 (D. Colo. Nov. 13, 2019) (quotation marks and alterations omitted) (quoting *Toone v. Wells Fargo Bank, N.A.*, 716 F.3d 516, 521 (10th Cir. 2013)).

Defendants attach to the Motion surveillance video from the Weld County Jail and body camera footage. (ECF No. 60.) They argue the Court may consider the videos without converting the Motion to a motion for summary judgment under Federal Rule of Civil Procedure 12(d), emphasizing that Rustgi included screenshots from the surveillance video into the FAC at paragraphs 33, 37, 38, 43 46, 48, and 50. (ECF No. 56 at 2–4; ECF No. 75 at 2–4.) In the Motion, Defendants have used the video evidence to include a section entitled "Relevant Factual Background, Including in Contravention of Complaint's Allegations," in which Defendants analyze and interpret the video evidence. (ECF No. 56 at 4.) They assert that in light of their analysis of the footage, Rustgi's allegations are "materially contradicted" and "must not be taken as true for purposes of this Motion." (*Id.* at 6.)

Rustgi disagrees, arguing that Defendants should wait for discovery to offer their own testimony and that the Court should disregard all evidence and gratuitous factual statements in the Motion outside the pleadings. (ECF No. 70 at 5–7.) Rustgi asserts that his counsel has reviewed the footage and disagree with Defendants'

characterization. (*Id.* at 6–7 n.3.) Importantly for the Court, Rustgi points out that the footage does not capture the actual use of force against him. (*Id.*)

The Court has considered the parties' arguments, and in its discretion, concludes it will not consider the video evidence at this time. Armed with the video footage, Defendants appear to be attempting to steer the discussion and analysis in the Motion to one which focuses on the disputed evidence standard under Rule 56, as opposed to the plausibility pleading standard under Rule 8 and assessed on a Rule 12 motion to dismiss. The Court finds that this video evidence, along with Defendants' related arguments, to be inappropriate for a proper Rule 12 sufficiency of the pleading analysis. The Court concludes as much despite Rustgi's decision to embed screenshots from the surveillance footage within his FAC. Of considerable significance here is the fact that while Rustgi has included such screenshots in the pleading, the Court will not rely on those images in ruling on the Motion. Nor will the Court consider Defendants' "Relevant Factual Background, Including in Contravention of Complaint's Allegations." While the Court will not consider the video footage in ruling on the Motion, nothing precludes Defendants from raising these arguments and referencing these materials in summary judgment motion practice.

> b.  *Claim One: § 1983 - Fourth and Fourteenth Amendment Violations for Excessive Force - Individual Liability (against Channel, Martinez, Thompson, Recor, Penny, Piscoya, Wilson, Coble, and Erickson)*

Before the Court addresses the parties' arguments regarding individual liability, it is imperative to emphasize that Rustgi alleges he was nothing more than a civilian college student when he was taken to the Jail on a detox hold. (¶¶ 2, 31.) He had not been charged with committing any crime, and no criminal charges were ever filed

against him arising out of the events precipitating this case. (*Id.*) To the extent the parties and the law define his status as a "pretrial detainee," the Court will apply the appropriate law and analysis. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("[A] detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."); *Thompson v. Hamilton*, 127 F.3d 1109, at *1 (10th Cir. 1997) ("Pretrial detainees are protected from excessive force that amounts to punishment under the Due Process Clause of the Fourteenth Amendment."). However, the Court underscores that Rustgi was not truly even an actual pretrial detainee at the time of the events at issue in this case, as he was not under arrest, or facing any criminal charges at the time. In the Court's view the more accurate label to assign to Rustgi at the time in question is that of civilian detainee. *See Essien v. Barr*, 457 F. Supp. 3d 1008, 1014 (D. Colo. 2020) (observing that "[t]he reasoning in *Kingsley* holds even more true in the civil detention context, such as immigration detention). For no reason other than to not confuse things further by using a status label different from that employed by the parties in the instant briefing, the Court will also refer to Plaintiff as a pretrial detainee in and for purposes of this Order only.

        (i)      Excessive Force against Recor, Penny, Piscoya, Wilson, and Martinez for Direct Participation and Failure to Intervene in Others' Use of Force

A pretrial detainee can state an excessive force claim by alleging "the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). In excessive-force cases arising out of jails, "objective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Ultimately, several factors "bear on the reasonableness or unreasonableness of the force used," including,

but not limited to: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.*

While "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . , violates the Fourth Amendment," *Graham*, 490 U.S. at 396, "[p]ushes and shoves, like other police conduct, must be judged under the Fourth Amendment standard of reasonableness." *Saucier v. Katz*, 533 U.S. 194, 209 (2001). The whole course of conduct of an officer in making an arrest or other seizure—including verbal exchanges with a subject—must be evaluated for Fourth Amendment reasonableness in light of the totality of the circumstances.[4] *See Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1194 (10th Cir. 2001).

---

[4] Defendants appear to encourage the Court to examine the firing of the concussion explosives and the smashing of Rustgi's face as separate instances of excessive force instead as an ongoing incident or course of conduct of excessive force. (ECF No. 56 at 23.) Rustgi opposes this construction of events, arguing the two uses of force "are pled as part and parcel of the excessive force claim filed by Plaintiff, not separate claims." (ECF No. 70 at 12 (citing *Rhodes v. Bd. of Cnty. Comm'rs for the Cnty. of Bernalillo*, 2017 WL 4155346, at *11 n.5 (D.N.M. Sept. 14, 2017) ("In light of the Court's ruling that Plaintiff has stated a claim that Defendants Beasley, James, and Kmatz violated his Fourth Amendment rights to be free of excessive force, rights which were clearly established at the time, the Court need not consider at this juncture whether each additional separate fact, specifically the use of the flash-bang grenade or placing and keeping him next to exhaust fumes, is sufficient on its own to state a Fourth Amendment claim.")).)

Given that the uses of force are pled as part of one claim for excessive force, and this is a Rule 12 analysis, the Court will adopt Rustgi's interpretation of events for the purposes of this Order. Supporting this interpretation, Defendants state in the reply that they agree the totality of the circumstances is the appropriate standard to apply in determining whether Rustgi's rights were violated. (ECF No. 75 at 8.) However, the Court notes that the FAC includes allegations against those Defendants who were not even in the room at the time Rustgi was allegedly assaulted (Coble and Erickson), and will carefully scrutinize those claims at subsequent stages of this litigation.

Defendants argue that Rustgi fails to plausibly allege that Recor, Penny, Piscoya, Wilson, or Martinez used excessive force. (ECF No. 75 at 4.) They contend that the allegations that these Defendants used a "gratuitous" amount of force and that it was "objectively unreasonable" to use concussion explosives in an attempt to gain Rustgi's compliance are conclusory. (*Id.*) Further, they argue that application of the *Kingsley* factors should lead the Court to conclude Rustgi has failed to state a claim.

The Court easily disagrees with these contentions. Applying the *Kingsley* factors, the Court finds that Rustgi has plausibly alleged a Fourth Amendment violation. As explained more fully in the Background section, Rustgi has alleged that: (1) he was compliant, posed no threat to law enforcement officers, and was in custody on a detox hold, so there was no need for the force applied (¶¶ 31, 34, 44); (2) Defendants did not "temper" or "limit" the force used, which was allegedly shocking and excessive (¶¶ 35, 48); (3) Rustgi did not pose a severe security issue (¶ 32); (4) no reasonable officer would have reasonably perceived Rustgi posed a threat, as he was in custody, was restrained (until officers uncuffed him), and was surrounded by deputies and in their control (¶ 32); and (5) Rustgi alleges he was not resisting (¶ 32).

The Court finds the allegations that Penny, Piscoya, and Martinez used excessive force against Rustgi are legally sufficient. Rustgi alleges that while he lay face down on the floor in the small room, Piscoya fired at least two concussion explosives from his Kel-Tec Shotgun in Rustgi's direction.[5] (¶ 48.) During the time

---

[5] The Court finds Defendants' argument that Rustgi claims no injury from the firing of the concussion explosive rounds unavailing. (ECF No. 75 at 5.) In *Cortez v. McCauley*, 478 F.3d 1108, 1131 (10th Cir. 2007), the Tenth Circuit stated that "[p]hysical contact is not required for an excessive force claim—patently unreasonable conduct is." That court also noted that the concurring and dissenting opinions disregarded possible injuries such as "emotional or psychological injury" resulting from "intimidation, fear for personal safety, loss of liberty, and

period when Piscoya fired the concussion explosives, Rustgi alleges that Penny "smashed [his] head and face into the floor so forcefully he broke [his] glasses and caused serious injury including a large gash and a concussion." (¶ 51.) Rustgi alleges that Piscoya and Penny acted consistent with the direction of Martinez, the supervisor present. (¶¶ 48, 51.)

The allegations against Recor and Wilson are less straightforward. Rustgi alleges that Wilson inserted earplugs in anticipation of the concussion explosions (¶ 36), helped escort Rustgi to the off-camera room, coordinated and communicated with Penny and Piscoya, endorsed their conduct, provided support for the assault, knowingly participated in the assault, and failed to intervene in and prevent the violence (¶ 53). The allegations against Recor are nearly the same. (¶ 52.) While the Court finds these allegations weaker than those against Penny, Piscoya, and Martinez, at this stage of the litigation, they are sufficient to state a claim. *See Mick v. Brewer*, 76 F.3d 1127, 1137 (10th Cir. 1996) (officer may be liable for failure to intervene if he "watched the incident and did nothing to prevent it"); *see also Fundiller v. City of Cooper City*, 777 F.2d 1436, 1442 (11th Cir. 1985) ("an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance").

(ii) Failure to Intervene against Coble and Erickson

"An officer who fails to intervene to prevent a fellow officer's excessive use of force may be liable under § 1983." *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008). "In order for liability to attach," however, "there must have been a realistic

privacy." *Id.* at 1131 n.28.

opportunity to intervene to prevent the harm from occurring.  Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is [usually] an issue of fact . . . ."  *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008).

Rustgi argues that Coble and Erickson are liable for failure to intervene because despite knowing Rustgi would be assaulted with explosives and physical violence, they did nothing to aid him.  Specifically, he alleges that "back in the lobby area, Defendants Coble and Erickson knew what was about to ensue—explosions and violence—based on the communications between them and based on the routine customs and policies of the SOGs in the jail." (¶ 46.)  He alleges that video footage shows that Coble and Erickson knew the SOG Defendants would soon fire their weapons and assault Rustgi, which is why Coble and Erickson covered their own ears to protect them from the deafening blasts.  (¶ 47.)  Further, Coble and Erickson allegedly smiled and joked about covering their ears, "as if this was an ordinary but entertaining part of their daily routine." (*Id.*)

Defendants argue that Coble and Erickson's position in the hallway, not in the room where he was assaulted, demonstrates that there was no reasonable opportunity for them to intervene.  (ECF 75 at 6.)  In addition, Defendants argue that because Penny dealt but a single blow, there was no opportunity to intervene.  (*Id.*)

The Court again emphasizes the relative weakness of the allegations against Coble and Erickson.  Their physical presence outside the room distinguishes their conduct from that of other Defendants such as Recor and Wilson.  However, because Rustgi alleges that Coble and Erickson's conduct regarding covering their ears and

coordination in anticipation of the concussion explosives plausibly means they had time to intervene—at least in connection with Piscoya's firing of the concussion explosives— the Court will not dismiss the allegations against them at this time.

(iii)    Supervisory Liability against Martinez and Channel

"[A] plaintiff must satisfy three elements to establish a successful § 1983 claim against a defendant based on his or her supervisory responsibilities: (1) personal involvement; (2) causation; and (3) state of mind." *Estate of Strong v. City of Northglenn, Colo.*, 2018 WL 1640251, at *5 (D. Colo. Apr. 5, 2018) (quoting *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014)).  In particular, the second element "requires the plaintiff to show that the defendant's alleged action(s) caused the constitutional violation by setting in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Id.*  A claim for supervisory liability requires "an affirmative link between the supervisor and the constitutional violation, meaning more than a supervisor's mere knowledge of his subordinate's conduct." *Id.* (internal quotation marks omitted).

As noted above, Rustgi alleges that Piscoya and Penny acted consistent with the direction of Martinez, a supervisor present at the scene.  (¶¶ 48, 51.)  This allegation is sufficient for supervisory liability at this stage.[6]

The allegations against Channel are distinguishable.  Rustgi merely alleges that "Defendant Channel, also a Sergeant, observed the preparation to assault Plaintiff and

_____

[6] Defendants state in the reply that "Martinez's mere presence at the scene of the restraint is insufficient to state a claim," and that "Plaintiff does not allege Martinez did anything to him."  (ECF No. 75 at 8.)  These arguments ignore the allegation that Piscoya and Penny acted at Martinez's direction.

similarly knew what would occur and endorsed the conduct and failed to prevent it." (¶ 57.)  Channel was not present in the room during the assault.  The allegations against Channel do not meet the criteria for supervisory liability, and the Court will dismiss the claims against Channel without prejudice.

(iv)  Qualified Immunity

(a)  Legal Standard

"Individual defendants named in a § 1983 action may raise a defense of qualified immunity, which shields public officials . . . from damages actions unless their conduct was unreasonable in light of clearly established law."  *Gutierrez v. Cobos*, 841 F.3d 895, 899 (10th Cir. 2016) (internal quotation marks omitted).  "Once the qualified immunity defense is asserted," as Defendants have done here, "the plaintiff bears a heavy two-part burden to show, first, the defendant[s'] actions violated a constitutional or statutory right, and, second, that the right was clearly established at the time of the conduct at issue."  *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks omitted).  "If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified immunity."  *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017), *cert. denied*, 138 S. Ct. 211 (2017).  "The judges of the district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"In this circuit, to show that a right is clearly established, the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Gutierrez*, 841 F.3d at 900 (internal quotation marks omitted).  "A plaintiff need not show

the very act in question previously was held unlawful in order to establish an absence of qualified immunity." *Id.* (internal quotation marks omitted). But "[a]n officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it." *City and Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (internal quotation marks omitted).

"The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (emphasis in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Therefore, a plaintiff may not defeat qualified immunity "simply by alleging violation of extremely abstract rights." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). Nonetheless, the clearly established inquiry "involves more than a scavenger hunt for prior cases with precisely the same facts. The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Perea v. Baca,* 817 F.3d 1198, 1204 (10th Cir. 2016) (internal quotation marks and citation omitted).

Because qualified immunity is immunity from suit, rather than a mere defense to liability, *Estate of Reat v. Rodriguez*, 824 F.3d 960, 964 (10th Cir. 2016), a court may dismiss the case with or without prejudice if it finds that a defendant is subject to qualified immunity. *Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1342 (10th Cir. 2000).

### (b)    Analysis

Given the Court's findings above in Parts II.A.2.b.i–iii, the Court finds Rustgi has met prong one of the qualified immunity analysis. Thus, the question remains whether

the constitutional right at issue was clearly established.

The Court holds that because Rustgi's status was a civilian on a detox hold, and not even a true pretrial detainee, the conduct he alleges Defendants employed against him was "more obviously egregious," and thus "less specificity is required to clearly establish the violation" under *Perea*. Rustgi provides a lengthy list of cases which he asserts "show 'fair notice' that gratuitously using explosives and smashing the face of a non-threatening, non-dangerous, non-resisting pretrial detainee, who was handcuffed (until they chose to unhandcuff him), and under the physical control of and surrounded by multiple officers, was not 'objectively reasonable.'" (ECF No. 70 at 15 (listing cases).)

As an initial matter, the Court notes that Defendants' arguments regarding the "clearly established" prong in the reply brief are more appropriate for summary judgment. (ECF No. 75 at 9–10.) For instance, Defendants argue that Rustgi's allegation that the fact that Defendants removed his handcuffs demonstrates that he was not a threat is not reasonable based on their interpretation of the surveillance video. (*Id.* at 9.) Additionally, they make distinctions between NDRs and flashbang grenades, noting differences in the size, production of light, sound, and delivery mechanism. (*Id.* at 10.) These arguments require the Court to make inferences and draw conclusions beyond the FAC, which the undersigned declines to do at this point in the litigation.

As the Tenth Circuit stated in *Casey v. City of Federal Heights*, "*Graham* establishes that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest." 509 F.3d 1278, 1285 (10th Cir. 2007) (citation omitted);

18

*see also Morris v. Noe*, 672 F.3d 1185, 1198 (10th Cir. 2012) (citing *Thornton v. City of Macon*, 132 F.3d 1395, 1400 (11th Cir. 1998) (holding where arrestees had not committed a serious crime, posed no immediate threat, and did not actively resist arrest, "the officers were not justified in using *any* force, and a reasonable officer thus would have recognized that the force used was excessive") (emphasis in original)). Similarly, in *York v. City of Las Cruces*, the Tenth Circuit determined qualified immunity did not apply where there was no evidence that the plaintiff, who struck his head and shoulder on pavement following an officer's execution of an "arm-bar takedown," was "attempting to evade arrest by flight," and the allegation that he was resisting arrest was disputed. 523 F.3d 1205, 1209, 1211 (10th Cir. 2008). In *McCoy v. Meyers*, the Tenth Circuit reiterated that cases need not be "factually identical" to find clearly established law, and that "factually analogous" cases may suffice. 887 F.3d 1034, 1052 (10th Cir. 2018) (citing *Dixon v. Richer*, 922 F.2d 1456 (10th Cir. 1991) and *Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008) in finding that "it was 'clearly established [on March 21, 2011] that officers may not continue to use force against a suspect who is effectively subdued" (alterations in original)); *see also McCowan v. Morales*, 945 F.3d 1276, 1289 (10th Cir. 2019) ("gratuitous application of force to McCowan, a fully subdued, compliant and non-threatening misdemeanant arrestee, violated the Fourth Amendment").

Rustgi has also cited authority demonstrating that "Tenth Circuit precedent clearly establishes that the use of such flash-bang explosives during a military-style assault on civilians may violate the Constitution when objectively unreasonable." (ECF No. 70 at 17 (citing *United States v. Myers*, 106 F.3d 936, 940 (10th Cir. 1997) (citing *Jenkins v. Wood*, 81 F.3d 988, 996–98 (10th Cir. 1996) (Henry, J., concurring) (noting

"right to be free from unreasonable flash bang" explosions)))).) While the Court notes

that *Myers* ultimately found the officers' use of force reasonable, *Myers* stated that it

"could not countenance the use of such a device as a routine matter." 106 F.3d at 940.

Rustgi has alleged that Defendants routinely deploy concussion explosives at the Jail.

As explained above, Rustgi alleges he was not violent, fleeing, or resisting law

enforcement officers in the Jail. Thus, under these cases it is reasonable that an officer

would be on notice that using force against him would violate the Constitution and that

participation in a supervisory capacity and failure to intervene create liability. As such,

the Court will deny qualified immunity as to this claim.

     c.     *Claim Two: § 1983 - Fourth and Fourteenth Amendment Violations for Excessive Force - Supervisory and Individual Liability (against Reams in his individual capacity)[7]*

Defendants argue that although Rustgi "*could* meet the personal-involvement

prong via adequate facts showing the Sheriff was responsible for but 'failed to create

and enforce policies to protect' him from use of NDRs [Nova Distraction Rounds] or a

singular blow," he fails to do so as a result of conclusory allegations that are "woefully

inadequate." (ECF No. 56 at 20 (emphasis added).) Defendants point to Rustgi's

allegation that Sheriff Reams had a "non-delegable duty to ensure he implemented

constitutional training and policies for WCSO. He has failed to do that . . . through his

own conduct and decision-making, as well as through hiring and working with Joseph

Garcia over a period of years to implement the [SOG]." (¶ 63.) Defendants also contest

the sufficiency of Rustgi's allegations regarding the causation element, arguing that

---

[7] The FAC alleges a claim against Sheriff Reams for supervisory and individual liability. (¶¶ 121–30.) However, in his response, Rustgi appears to only argue "supervisory liability against [Sheriff] Reams individually." (ECF No. 70 at 18.) Thus, the Court addresses Rustgi's arguments against Sheriff Reams in his capacity as a supervisor.

apart from taking issue with Garcia's training, which Rustgi cannot show is wrongful, he fails to meet the causation prong. (ECF No. 56 at 20.) Finally, Defendants argue Rustgi has failed to show the requisite culpable state of mind via adequate facts indicating that Sheriff Reams acted with deliberate indifference.[8] (*Id.*) Based on their arguments, Defendants argue Sheriff Reams is entitled to qualified immunity, as Rustgi has not identified a case where "an official acting in a situation similar to the Sheriff was held to have violated the Constitution under a supervisory liability theory for engaging a contractor like Garcia to provide tactical and weapons training including the use of NDRs." (*Id.* at 22.)

The Court has given Defendants' arguments due consideration but finds that Rustgi has properly pled a supervisory liability claim against Sheriff Reams. Rustgi describes at length Sheriff Reams's actions in implementing policies and training to turn the Jail into a militarized environment in which even pretrial detainees like Rustgi could be brutalized. (¶ 62.) Rustgi pleads that Sheriff Reams participated in and implemented the creation of the SOGS and their ongoing use of excessive force, militarized tactics, and weaponry. (¶ 123.)

The FAC contains allegations that "through his own policies and also by hiring Garcia and his companies, [Sheriff] Reams has authorized a military combat approach to pretrial detention, and has trained WCSO staff to be quick to use unreasonable violence and force." (¶ 73.) Rustgi further alleges that "[Sheriff] Reams has authorized

---

[8] "The deliberate-indifference test has three requirements: (1) the Sheriff was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]'; (2) he actually drew the inference; and (3) he was 'aware of and fail[ed] to take reasonable steps to alleviate that risk.'" (ECF No. 56 at 21 (quoting *Keith v. Koerner*, 843 F.3d 833, 847 (10th Cir. 2016).)

WCSO staff to use weapons unnecessarily and unreasonably against pretrial detainees like Plaintiff, specifically including the Kel-Tec Shotgun and the concussion explosion rounds used against Plaintiff." (¶ 74.) Moreover, Rustgi has pled that Sheriff Reams knew about prior similar instances of excessive force by SOGs and others but did nothing to correct the problem or prevent future harm. (¶ 98; ECF No. 70 at 19 (citing *Lopez v. LeMaster*, 172 F.3d 756, 762 (10th Cir. 1999), *abrogated on other grounds*, *Brown v. Flowers*, 974 F.3d 1178, 1182 (10th Cir. 2020) (Sheriff could be individually liable where there had been "at least one" prior inmate attack in the jail and he was on notice of the dangers)).) Defendants argument that the prior instances of misconduct were of a "materially different nature" than the actions here is immaterial.

In addition, the Court finds Sheriff Reams is not entitled to qualified immunity. "The Tenth Circuit has . . . emphasized the Supreme Court's statements that, in some situations, 'clearly established general rules of law can provide notice of the unlawfulness of an official's conduct in appropriate circumstances.'" *Stevenson v. City of Albuquerque*, 446 F. Supp. 3d 806, 854 (D.N.M. 2020) (quoting *A.N. by & through Ponder v. Syling*, 928 F.3d 1191, 1198 (10th Cir. 2019)). The Tenth Circuit has commented: "'[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers' that their conduct violates a constitutional right, and that such statements provide the required notice when 'the unlawfulness' of their conduct is 'apparent' from the pre-existing law." *Id.* (quoting *A.N. by & through Ponder*, 928 F.3d at 1198). According to the Tenth Circuit, "In other words, '[g]eneral statements of the law can clearly establish a right for qualified immunity purposes if they apply with obvious clarity to the specific conduct in question.' And this is so 'even though the very

action in question has not previously been held unlawful.'" *Id.* (quoting *A.N. by & through Ponder*, 928 F.3d at 1198).

Here, the Court agrees with Rustgi that Sheriff Reams had "fair notice" that his conduct as a supervisor under these circumstances was unconstitutional. In his response, Rustgi lists numerous cases which show "fair notice" that gratuitously using explosives and forcefully smashing the face of a non-threatening, non-dangerous, non-resisting pretrial detainee, who was handcuffed (until Defendants chose to uncuff him), and under the physical control of and surrounded by a large number of officers armed with military-style weapons, was not "objectively reasonable." (ECF No. 70 at 15–16.) And, as explained above, Rustgi has sufficiently alleged that his clearly established rights were violated. He has pled that Sheriff Reams created a military-style culture at the Jail, which condoned the use of concussion explosives and physical violence, and then failed to take reasonable measures to ensure pretrial detainees, like Rustgi, were safe from the risk of harm by law enforcement at the Jail.

Because Rustgi possessed a clearly established constitutional right and has alleged a constitutional violation by Sheriff Reams, dismissal is inappropriate on qualified immunity grounds. *See Keith v. Koerner*, 843 F.3d 833, 850 (10th Cir. 2016) (finding summary judgment inappropriate on qualified immunity grounds where plaintiff possessed a clearly established constitutional right and presented evidence of a constitutional violation by the defendant).

     d.    *Claim Three: § 1983 - Fourth and Fourteenth Amendment Violations - Monell Liability (against Reams in his official capacity and the BOCC)*

Section 1983 imposes liability on

    [e]very person who, under color of any statute, ordinance,

> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected,
> any citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges,
> or immunities secured by the Constitution and laws . . . .

42 U.S.C. § 1983. The Supreme Court held in *Monell v. Department of Social Services* that "person," as used in this statute, includes "municipalities and other local government units," more specifically, "local government units which are not considered part of the State for Eleventh Amendment purposes." 436 U.S. 658, 691 & n.54 (1978).[9]

A local government unit can be liable for damages under 42 U.S.C. § 1983 only when its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury." *Id.* at 694. The Supreme Court has thus "required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury," thereby "ensur[ing] that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality," rather than holding the municipality liable simply because it employed a constitutional wrongdoer. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403–04 (1997).

The relevant policy or custom can take several forms, including:

> (1) a formal regulation or policy statement; (2) an informal

---

[9] The Eleventh Amendment reads, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." The Supreme Court construes this language to mean, among other things, that states may not be sued (even by their own citizens) for money damages in federal court. *See Hans v. Louisiana*, 134 U.S. 1, 10–15 (1890).

> custom amounting to a widespread practice that, although
> not authorized by written law or express municipal policy, is
> so permanent and well settled as to constitute a custom or
> usage with the force of law; (3) the decisions of employees
> with final policymaking authority; (4) the ratification by such
> final policymakers of the decisions—and the basis for
> them—of subordinates to whom authority was delegated
> subject to these policymakers' review and approval; or
> (5) the failure to adequately train or supervise employees, so
> long as that failure results from deliberate indifference to the
> injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotation

marks omitted; alterations incorporated).  But, whatever species of policy or custom is

alleged,

> [t]he plaintiff must also demonstrate that, through its
> *deliberate* conduct, the municipality was the "moving force"
> behind the injury alleged.  That is, a plaintiff must show that
> the municipal action was taken with the requisite degree of
> culpability and must demonstrate a direct causal link
> between the municipal action and the deprivation of federal
> rights.

*Bryan Cnty.*, 520 U.S. at 404 (emphasis in original).

(i)      Sheriff Reams

Rustgi has sued Sheriff Reams in his official capacity and has sued the BOCC.

As such, Defendants argue both claims amount to actions against the County and are

thus redundant.  (ECF No. 56 at 9.)

The Court agrees.  "[A]n official capacity suit is, in all respects other than name,

to be treated as a suit against the entity."  *Kentucky v. Graham*, 473 U.S. 159, 166

(1985); *Couser v. Gay*, 959 F.3d 1018, 1023 (10th Cir. 2020) (recognizing that official

capacity suits "impose[ ] liability on the entity that [the sued public servant] represents"

(quoting *Brandon v. Holt*, 469 U.S. 464, 471 (1985)).  Because Rustgi has sued the

BOCC, a suit against Sheriff Reams in his official capacity is duplicative.[10]  Therefore,

the claims against Sheriff Reams in his official capacity are dismissed.

(ii)　　BOCC

(a)　　Failure to Train

"[T]he inadequacy of police training may serve as a basis for § 1983 liability only

where the failure to train amounts to deliberate indifference to the rights of persons with

whom the police come into contact.'"  *Allen v. Muskogee*, 119 F.3d 837, 841 (10th Cir.

1997) (quoting *City of Canton v. Harris*, 489 U.S. 378, 392 (1989)).  The "well

established" elements of a § 1983 claim for inadequate use of force training for police

require a showing:

> (1) the officers exceeded constitutional limitations on the use
> of force; (2) the use of force arose under circumstances that
> constitute a usual and recurring situation with which police
> officers must deal; (3) the inadequate training demonstrates
> a deliberate indifference on the part of the city toward
> persons with whom the police officers come into contact; and
> (4) there is a direct causal link between the constitutional
> deprivation and the inadequate training.

*Id.*

"However, a municipality's culpability for a deprivation of rights is at its most

tenuous where a claim turns on a failure to train."  *Erickson v. City of Lakewood, Colo.*,

489 F. Supp. 3d 1192, 1207 (D. Colo. 2020) (alterations omitted) (quoting *Connick v.

Thompson*, 563 U.S. 51, 61 (2011)); *see also Oklahoma City v. Tuttle*, 471 U.S. 808,

---

[10] In his response brief, Rustgi cites *Lopez*, 172 F.3d at 762, for the proposition that
naming Sheriff Reams "is appropriate given his official decisions are at issue (and he is sued
individually), and cases are clear that the elected Sheriff, as final decisionmaker, is a proper
official capacity defendant."  (ECF No. 70 at 24.)  However, in *Lopez*, Jackson County was not a
named defendant, so it was proper to sue the Sheriff in his official capacity.  Here, because
Rustgi has sued the BOCC, the claims against Sheriff Reams in his official capacity are
redundant.

822–23 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*.").

The Court finds Rustgi has sufficiently pled a failure to train claim against the BOCC. At a general level, Rustgi alleges that Sheriff Reams "hired a contractor named Joseph Garcia to assist him in training and implementing the Special Operations Group in WCSO." (¶ 3.) Further, "Defendant Reams and Garcia trained deputies to use a variety of weapons and tactics in the jail setting, including shotguns, concussion explosives, and physical violence, as used against Plaintiff." (*Id.*) Rusti alleges that "Defendant Reams intentionally hired Garcia from 2016 to the present to assist him in implementing the unconstitutional policies and training . . . , which are also contrary to any legitimate penal justification, contrary to appropriate standards in the detention setting, and extremely dangerous and unnecessary." (¶ 4.) Further, [t]he SOGS are trained to intimidate and be unnecessarily aggressive and violent with detainees, and to escalate the use of force against detainees unreasonably and precipitously." (¶ 7.) "The SOGs are trained by Defendant Reams to view themselves as warriors against enemy combatants, to use weapons unlawfully and dangerously, and generally to treat detainees held in the jail as enemies to be intimidated and victimized by violence." (*Id.*) Ultimately, Rustgi alleges that Sheriff Reams has failed to implement constitutional training and policies for WCSO. (¶ 63.)

As to the first element, the Court has previously found that Rustgi has alleged that the individual Defendants exceeded the constitutional limitations on the use of

force.  *See* Part III.A.2.  Element two is thus assumed to be established.[11]  Rustgi has sufficiently alleged that the inadequate training of the SOGs and other law enforcement officers caused and was a moving force behind his assault.  (¶¶ 3, 9, 72, 136, 138.)

As to the third element, "[t]o state a *Monell* claim based on the failure to train or supervise, a plaintiff must sufficiently allege that the failure amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *Sanchez v. City of Littleton*, 491 F. Supp. 3d 904, 921 (D. Colo. 2020) (internal quotations and citation omitted).  Rustgi specifically alleges Sheriff Reams hired Garcia in 2016 to assist with implementing the allegedly unconstitutional training methods.  (¶ 4.)  He specifies why the training is deficient, including that the "SOGs are trained to intimidate and be unnecessarily aggressive and violent with detainees, and to escalate the use of force against detainees unreasonably and precipitously."  (¶ 7.)

"A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (quotation omitted).  In addition, Rustgi has alleged that there are ongoing constitutional violations in the Jail as a result of the deficient training dating back to at least 2017, which prompted the United States Attorney's Office for the District of Colorado to launch an (apparently ongoing) inquiry into alleged civil rights abuses in the Jail.  (¶ 11.)  He also alleges eight other specific instances of unjustified violence by SOGs.  (¶ 98.)  Although Defendants take issue with the fact that the other instances

---

[11] In their response, Defendants state that "[e]ven assuming, *arguendo*, Plaintiff can establish the second element [the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal], Plaintiff fails to provide any support for the first, third, or fourth elements."  (ECF No. 56 at 10.)  Based on this statement, the Court, too, will assume Rustgi can establish the second element and will address only the remaining elements.

describe force in the form of tasing and shooting with projectiles (ECF No. 75 at 12), the Court finds these alleged instances sufficient to demonstrate a pattern of similar conduct that would demonstrate a failure to train.

At this stage of the litigation, the Court finds these allegations sufficient to plausibly state a claim of municipal liability for failure to train.

(b)     Sheriff Reams as a Final Decisionmaker

First, the BOCC may be liable on the basis that Sheriff Reams is a final policymaker with regard to its jail, such that his actions "may fairly be said to be those of the municipality." *Lopez*, 172 F.3d at 763 (citation omitted). Second, the non-delegable duty doctrine essentially holds that the government cannot avoid § 1983 liability by contracting out its constitutional duties to a third party. *See Estate of Walter by & through Klodnicki v. Corr. Healthcare Cos., Inc.*, 323 F. Supp. 3d 1199, 1215 (D. Colo. 2018).

Rustgi alleges that Sheriff Reams, as Sheriff of Weld County, "had a non-delegable duty to ensure he implemented constitutional training and policies for WCSO." (¶ 63.) "He has failed to do that knowingly and intentionally through his own conduct and decision-making, as well as through hiring and working with Joseph Garcia over a period of years to implement the Special Operations Group described herein." (*Id.*) Further, Rustgi alleges that the BOCC is liable for the unconstitutional policies and training involving Garcia. (¶ 72.) Through these policies and training, Sheriff Reams has allegedly "authorized a military combat approach to pretrial detention, and has trained WCSO staff to be quick to use unreasonable violence and force." (¶ 73.)

It is undisputed that Sheriff Reams is a final decisionmaker and policymaker for the BOCC. (¶¶ 19, 61; ECF 75 at 16.) Nonetheless, Defendants argue that Rustgi has

failed to point to any specific policy authored by Sheriff Reams nor a specific decision, besides contracting with Garcia, that Sheriff Reams made.  (ECF No. 75 at 16.)

This argument borders on the disingenuous.  Rustgi alleges that Sheriff Reams's decision—as a final decisionmaker for the BOCC—to contract with Garcia and implement his tactics, which involve routine violence, explosives, and military-style assault tactics against detainees (¶¶ 65–83) violates the non-delegable duty doctrine. (ECF No. 70 at 28.)  Rustgi alleges that Sheriff Reams's decision to hire Garcia and implement his policies of converting civilian law enforcement officers into paramilitary commandos led to a militaristic culture at the Jail which created an environment conducive to excessive violence and force against even pretrial detainees like Rustgi. These allegations of the widespread militarization of the Weld County Sheriff's Office are deeply troubling to the Court.  They paint a picture of what one might expect in a developing country bereft of the rule of law, and not in the Sheriff's office of one of the counties of the United States.  The Court finds that at the Rule 12 stage, such allegations are more than sufficient to state a claim of municipal liability.

(c)     Unwritten Custom and Standard Practice

"[A]n act performed pursuant to a custom that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."  *Bryan Cnty.*, 520 U.S. at 404 (internal quotation marks omitted); *see also City of St. Louis v. Prapotnik*, 485 U.S. 112, 127 (1988) (establishing an informal policy or custom requires the plaintiff to show that the misconduct was widespread—*i.e.*, that it involved a series of decisions).

Here, Rustgi alleges that Sheriff Reams has implemented an unconstitutional

custom amounting to official policy "through the daily routine use of SOGs and their weaponry and excessive force as alleged herein, which itself violates even the written policies of the WCSO[12] as well as the Constitution."  (¶ 84.)  Further, he pleads:

> In custom and practice, as alleged herein, SOGs patrol the jail constantly and do not only respond to "critical" or especially hazardous incidents.  Violating that written policy, as in this case, SOGs have a custom to routinely terrorize and brutalize people in pretrial detention who are unarmed, not violent, and where no crisis exists at all.  In fact, in this case multiple regular deputies interacted with Plaintiff, had escorted Plaintiff, and were present with the SOGs as the group assaulted Plaintiff.  There was nothing unusual or critical about Plaintiff's situation necessitating SOGs or any use of force, and their conduct and utilization in this case was plainly excessive and unconstitutional as alleged herein. The routine, daily presence and conduct of the SOGs in the jail clearly amounts to a custom that constitutes official policy and the standard operating procedure for Weld County jail, in violation of their own rules.

(¶ 86.)  Defendants' arguments that review of the surveillance and body worn camera footage refutes Rustgi's allegations rely on evidence outside the scope of this Order, and the Court will not consider them here.  Based on the aforementioned allegations, the Court finds that Rustgi has plausibly alleged that Sheriff Reams implemented a widespread practice of using allegedly excessive force through the SOGs.

      e.    *Claim Four: § 1983 - Fourteenth Amendment Substantive Due Process Violation (against all Individual Defendants)*

A substantive due process claim is pled where a detainee alleges either (1) punishment or (2) "objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation

---

[12] "The official WCSO policy 523.1.2 states that SOGs should only be used 'to resolve critical incidents that are so hazardous, complex or unusual that they exceed the capabilities of Detention Deputies to handle safely. This includes, but is not limited to, hostage taking, barricaded suspects, and other high-risk incidents.'"  (¶ 85.)

to that purpose." *Colbruno v. Kessler*, 928 F.3d 1155, 1163 (10th Cir. 2019) (citations omitted); *Bell*, 441 U.S. at 535 ("[A] detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.").

Rustgi has sufficiently alleged a substantive due process violation. In the FAC, he alleges that "Defendants' conduct constituted unlawful punishment of Plaintiff as a pretrial detainee not convicted of any crime." (¶ 145.) He further alleges that "Defendants' conduct was objectively unreasonable as any objectively reasonable officer would know and violated clearly established constitutional law" (¶ 146), and that "Defendants['] conduct also shocks the conscience and interferes with fundamental rights implicit in the concept of ordered liberty and is offensive to human dignity" (¶ 147). Taking Rustgi's allegations that Defendants' use of force was "methodical, coordinated, and premeditated" (¶¶ 35, 40, 47, 54, 58) as true, the Court finds it is a reasonable inference at the Rule 12 stage that Defendants' conduct was intended to punish Rustgi for some reason.[13]

Next, Defendants assert qualified immunity and argue Rustgi has failed to "tether his due process claim to any relevant precedent existing prior to June 23, 2018," and has thus not pointed to clearly established law demonstrating that the right at issue was clearly established. (ECF No. 75 at 14.) While *Myers* and *Holland* are, as Defendants point out, not clear factual antecedents for Rustgi's case, the Court concludes that in this situation, it is appropriate to "rely on the general proposition that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted even

---

[13] Because the Court finds Rustgi has sufficiently alleged "punishment," it need not make a finding as to whether he has alleged "objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Colbruno*, 928 F.3d at 1163 (quotes omitted).

though existing precedent does not address similar circumstances." *Colbruno*, 928 F.3d at 1165 (internal quotation marks, citations, and alterations in original omitted.)  Given Rustgi's status as a civilian on nothing more than a detox hold, that he had not been arrested for or charged with any crime, that he was not fleeing or resisting law enforcement officers, and that he was in the officers' control in a jail environment, it should have been sufficiently clear to law enforcement that the use of concussion explosives and the forceful slamming Rustgi's face to the floor were did not comport with the requirements of the Constitution.  For these reasons, the Court denies qualified immunity to Defendants on Rustgi's substantive due process claim.

**B.      Motion to Bifurcate Discovery and Trial**

The Court now turns to Defendants' Motion to Bifurcate, which argues that the Court should first try Rustgi's claims against the individual Defendants, and then, if the jury finds them liable, hold a second trial on Rustgi's *Monell* theories.

1.      <u>Legal Standard</u>

Federal Rule of Civil Procedure 42(b) provides the district court with broad discretion to order a separate trial of one or more separate issues or claims "[f]or convenience, to avoid prejudice, or to expedite and economize." *United States ex rel. Bahrani v. ConAgra, Inc.*, 624 F.3d 1275, 1283 (10th Cir. 2010).  The decision to bifurcate a trial "must be made with regard to judicial efficiency, judicial resources, and the likelihood that a single proceeding will unduly prejudice either party or confuse the jury." *York v. Am. Tel. & Tel. Co.*, 95 F.3d 948, 958 (10th Cir. 1996).  "Bifurcation is not an abuse of discretion if such interests favor separation of issues and the issues are clearly separable." *Angelo v. Armstrong World Indus., Inc.*, 11 F.3d 957, 964 (10th Cir. 1993).  But bifurcation may be an abuse of discretion if it is unfair or prejudicial to a

party.  *See id.*

2.    Analysis

Defendants argue that the Court should bifurcate discovery and trial of the

individual liability claims (first) from the entity liability claims (second), in furtherance of

convenience, to avoid prejudice, and because separate trials will aid in expedition,

economy, and avoidance of inconsistent verdicts.  (ECF No. 44 at 2.)  Defendants cite

case law supporting bifurcation in this instance.

In response, Rustgi asserts that given the close connection and overlap between

the claims, bifurcation would be expensive, waste time, and duplicate the litigation.

(ECF No. 51 at 3.)  In addition, Rustgi asserts that bifurcation would prejudice his ability

to develop discovery toward both individual and *Monell* liability—matters which

substantially overlap.  (*Id.*)

The Court has carefully considered the parties' *extensive* briefing on this issue.

(ECF Nos. 44, 51, 58.)  Despite Defendants' arguments, the Court agrees with Rustgi

and will not bifurcate the individual liability discovery or trial from that related to entity

liability.  Bifurcation in this case, where there is close connection and overlap between

the individual and entity liability claims, would be costly, waste time, and result in

duplicative litigation.  The Court reached a similar conclusion in another § 1983 civil

rights action based on excessive force and sees no reason to deviate from that

reasoning here.  *See Valdez v. Motyka*, 2020 WL 3963717, at *17 (D. Colo. July 13,

2020) (denying motion to bifurcate where *Monell* claims are "closely connected" to

individual liability claims); *see also Est. of Melvin by & through Melvin v. City of Colo.

Springs, Colo.*, 2021 WL 50872, at *2 (D. Colo. Jan. 5, 2021) ("Bifurcation of Plaintiff's

individual and municipal liability claims would allow this case to languish on the Court's

docket, potentially for years, and would be inconsistent with the Court's obligation to oversee 'the just, speedy, and inexpensive determination of every action and proceeding.'").

For these reasons the Motion to Bifurcate is denied.

### III. CONCLUSION

For the reasons stated above, the Court ORDERS the following:

1. Defendants' Motion to Dismiss Plaintiff Tage Rustgi's Amended Complaint (ECF No. 56) is GRANTED IN PART in part to the extent that all claims against Defendant Cory Channel are DISMISSED WITHOUT PREJUDICE, and the official capacity claims against Sheriff Reams are DISMISSED WITH PREJUDICE. In all other respects the Motion is DENIED;

2. The Motion to Bifurcate (ECF No. 44) is DENIED;

3. The stay of proceedings (ECF No. 63) is LIFTED; and

4. The parties shall contact the chambers of United State Magistrate Judge Scott T. Varholak by **May 3, 2021** to set a status conference or such other proceeding as Judge Varholak deems appropriate to move this action forward.

Dated this 29th day of April, 2021.

BY THE COURT:

William J. Martinez
United States District Judge